PEOPLE v OSANTOWSKI

Docket No. 264368. Submitted February 13, 2007, at Detroit. Decided March 8, 2007, at 9:00 a.m.

Andrew P. Osantowski was convicted by a jury in the Macomb Circuit Court of making a false report or threat of terrorism, MCL 750.543m; using a computer to commit a crime, MCL 752.796 and MCL 752.797(3)(f); and possession of a firearm during the commission of a felony, 750.227b, in connection with threatening messages he posted online. After the messages were brought to the attention of law enforcement authorities, a search of the defendant's home revealed assault weapons, ammunition, and pipe-bomb components. The trial court, Matthew Switalski, J., sentenced defendant to 30 months to 20 years of imprisonment for the terrorism and computer crimes, and to a consecutive two years of imprisonment for the felony-firearm conviction. The defendant appealed his convictions, and the prosecutor cross-appealed the sentence.

The Court of Appeals *held*:

1. The Michigan Anti-Terrorism Act, MCL 750.543a *et seq.*, prohibits only true threats, which extend beyond the type of speech or expressive conduct that the First Amendment protects. Although the term "threat" is not defined in the statute, its meaning is easily ascertained by using its dictionary definition in conjunction with its context within the statute. Contrary to the defendant's argument, an intent to intimidate is not a necessary element of a true threat. Accordingly, the act is neither overbroad nor vague. Further, the language of the statute provides a person of ordinary intelligence a reasonable opportunity to know what behavior or conduct is prohibited.

2. The trial court did not abuse its discretion by admitting evidence that the defendant possessed guns, bomb-making materials, knives, and ammunition, because it was material to the determination whether the defendant's words were a true threat rather than mere hyperbole and was relevant to assessing the defendant's credibility in asserting his lack of intent to do harm. Additionally, this evidence was relevant to establishing the defendant's guilt of possessing firearms during the commission of a felony.

3. The trial court did not err by using the dictionary definition of "threat" when instructing the jury, because it is proper to look

to the dictionary for definitions of terms that a statute does not define, and because the dictionary definition of "threat" was consistent with the manner in which courts have defined "true threats" for First Amendment purposes.

4. There was sufficient evidence to support the defendant's convictions. The defendant unambiguously stated that he was going to kill his family on "judgment day," that he planned to bring guns to school and ask students why he should spare their lives, and that he was more determined than ever to kill a certain police officer, and he does not contest that he used a computer to communicate these messages.

5. The Court of Appeals has already ruled, after reviewing the record of the hearing on the matter, that the entirety of the defendant's confession was admissible at trial; therefore, under the law of the case doctrine, the defendant may not raise this issue again in this appeal.

6. Although the affidavit supporting the search warrant did not adequately connect the place to be searched to the defendant because it indicated only that a car owned by a man named Marvin Osantowski was parked in front of the address in question, in light of the fact that the police department knew that Marvin Osantowski was the defendant's father, evidence of the items seized need not be suppressed as a result of this good-faith oversight.

7. The trial court erred in failing to score 100 points under offense variable 20 of the sentencing guidelines for the defendant's threatened use of an explosive device.

Affirmed in part, vacated in part, and remanded for resentencing.

1. STATUTES — ANTI-TERRORISM ACT — CONSTITUTIONALITY — OVERBREADTH.

The Anti-Terrorism Act is not overbroad because it prohibits only true threats, which extend beyond the type of speech or expressive conduct that the First Amendment protects (MCL 750.543a *et seq.*).

2. STATUTES — ANTI-TERRORISM ACT — CONSTITUTIONALITY — VAGUENESS.

The Anti-Terrorism Act is not unconstitutionally vague despite the fact that the term "threat" is not defined in the statute, because the meaning of "threat" is easily ascertained by using its dictionary definition in conjunction with its context within the statute (MCL 750.543a *et seq.*).

*Michael A. Cox*, Attorney General, *Thomas L. Casey*, Solicitor General, *Eric J. Smith*, Prosecuting Attorney,

*Robert Berlin,* Chief Appellate Attorney, and *Joshua D. Abbott,* Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *Marla R. McCowan*) for the defendant.

Before: O'CONNELL, P.J., and SAAD and TALBOT, JJ.

TALBOT, J. Defendant appeals his jury trial convictions of making a false report or threat of terrorism, MCL 750.543m; using a computer to commit a crime, MCL 752.796 and MCL 752.797(3)(f); and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b.[1] Defendant was sentenced to 30 months' to 20 years' imprisonment for both the threat of terrorism and using a computer to make a threat of terrorism convictions and to a consecutive two years' imprisonment for the felony-firearm conviction. The prosecutor cross-appeals, asserting a scoring error in the trial court's sentencing of defendant. We affirm in part, vacate in part, and remand for resentencing.

Defendant's convictions stem from electronic chat room conversations that defendant engaged in under the screen name "nazi_bot_sadistic." The primary topics for defendant in these communications were his feelings of hate and his plans for the infliction of death and terror on his own family members and other individuals whom he perceived as deserving of the fate defendant chose for them:[2]

---

[1] Defendant pleaded guilty to charges of receiving and concealing stolen firearms, MCL 750.535b, and does not challenge the convictions or sentences of 18 to 120 months' imprisonment on each count stemming from these charges on appeal.

[2] The communications at issue are presented in their original form, including spelling and grammatical errors.

> i cant imagine going through life without killing a few
> people ... nothing wrong with killion ... people can be
> kissing my shotgun straight out of doom ... i tell it how it
> is ... if u dont like it, u die ... if i dont like what u stand
> for, you die ... if i dont like the way u look at me, u die ...
> i choose who lives and who dies ....

Referencing his intent to engage in "my rampage" and asserting his readiness to act as being "on the brink of mass murder," defendant questioned whether others would later contemplate "why did he kill all these white people." Defendant wrote that "im going to bring nightmares back to everyone" and "roam the land as a ghost still killing people."

In these online conversations, defendant discussed his social isolation and stress at school, stating:

> i cant even take going to school ... fuckin bullied ...
> made fun of ... pushed ... people can get away with
> murder ... thinking about school ... how im going to get
> my ass kicked and made fun of ... look at this, 8 months to
> live, people ruined my life, i dont even have any friend ...
> i think girls realized that my real girl is violence ... fuck
> this ... not even after i kill people will that be near fair
> payback not even close ... i cant wait till doom becomes
> reality ... its funny ... having the power to control who
> lives and who dies ... saying peeakboo under tables and
> aking people why i should spare their lives and why they
> believei n god ....

Defendant hypothesized why school shootings did not occur "in the 30 40 50s," despite the prevalence of guns and opportunity, and suggested that integration and the lack of values being taught now are responsible for the increase in school violence, asserting that "DIVERSITY KILLS." Expressing his concurrence with Hitler's ideals and implying that genocide was, in actuality, an attempt "to do a good thing," defendant later indicates that he would use the term "mass murderer" to label himself.

Defendant bragged about the weapons at his disposal, referencing his "stolen AK," shotguns with a "6 shot capacity before reload" and shortened barrels, "high capacity magazines" and "14 40rd mags for one rifle," and discussed videotaping himself with the guns and building pipe bombs. Defendant indicated he had sufficient weapons at his disposal to effectuate his plans, stating:

> CHOOSE TO DIE IN THE NEAR FUTURE . . . ITS YOUR CHOICE . . . ANYTIME . . . IS A GO NOW . . . IT NO LONGER MATTERS WHEN . . . WHENEVER I DEEM RIGHT . . . I STILL NEED MORE STUFF IN . . . BUT I GOT THE BULK OF IT.

Defendant further asserted:

> THEIR ALL PLAYING INTO MY FAVOR . . . see it really just topped notched the no burning back scale . . . NOW I DONT CARE IF THEIR ARE 500 POLICE . . . around the school . . . because if someone is determined enough to do something . . . they will do it . . . put all the security measures you ever want in there . . . it doesnt matter . . . if someone wants to do something, they will do it.

Additionally, defendant acknowledged that he was currently facing serious criminal charges,[3] stating:

> and the detective that is prosecuting me is sheriff deputy at my school, its she . . . so looks like ill be kicking up nbk some time soon . . . since im facing 5 years in prison/10,000 dollar fine/or 3 times the amount of damage . . . whichever is greater . . . now im not even worried

---

[3] Notably, in July 2004, defendant and his father, Marvin Osantowski, were charged with the theft of a golf cart. It is assumed that defendant, in this message, was referring to Clinton Township police officer Deena Terzo, the police liaison officer for the school system in which defendant was enrolled and who also was involved in the golf cart investigation.

about getting into a gunfight with her . . . cause it doestn
matter . . . now im more than ever determined to blow her
head off.

Defendant admitted that he had previously been expelled from a private school, asserting the basis for his school expulsion was the existence of rumors that he had been "looking for guns."

The recipient of defendant's online communications was a female teenager, Celia McGinty, with the screen name "dazedck00." Although McGinty engaged in ongoing conversations with defendant over the Internet, her concern regarding several of defendant's statements and assertions became evident as their conversations continued. When defendant bragged that he would be "famous" and "everyone will know who i am," McGinty responded, "whoa now . . . WTF are you talking about . . . ." After defendant affirmed his belief in the propriety of killing, McGinty indicated she was at a loss regarding "how im supposed to respond" and suggested defendant's assertions "sounds like bullshit to me." Despite initial disbelief, McGinty began to convey her concern, stating:

are you serious . . . and your gonnasee what you
wanna see . . . i believe you i think its a stupid idea and
this point your trying to prove isnt gonna end up the way
you want it.

After defendant described his guns and ammunition, McGinty responded, "i think your crazy," and inquired whether defendant had ever discussed these ideas with anyone else. In response, defendant asserted that "im the real deal." Defendant appears to have acknowledged McGinty's growing uncertainty regarding his assertions by indicating, "IF YOU DONTL IKE WHAT I SAY . . . BLOCK ME . . . I WANTUTO.

McGinty gave copies of her online conversations with defendant to her father, George McGinty, a sergeant with the Washington State University Police Department, who in turn forwarded copies to the Clinton Township Police Department. The Clinton Township Police Department initiated an investigation and contacted defendant's school regarding the content of his communications with McGinty. Defendant was arrested on September 16, 2004, while attending class at Chippewa Valley High School. Because of concerns by parents and school officials, late afternoon and evening school-related events were canceled.

Although a search of defendant's school locker failed to locate any weapons, following the issuance and execution of a search warrant for defendant's home, police located in defendant's bedroom, and in the attic crawl space accessible from that room, an AK-47 semiautomatic assault rifle, a Mossberg shotgun, an Escort shotgun,[4] a significant amount of ammunition, several knives, and a toolbox containing pipe bomb components (including several metal pipes, some with capped ends with screws or nails affixed to the outside), propane containers, bottles of ammonium nitrate and aluminum nitrate, and cans of sterno.

When questioned by the police, defendant denied an intention to hurt anyone, and said that his references to weapons and prior criminal activity were "all talk." Defendant asserted that his statements regarding the detective in his online chats were not "meant as a direct threat," but were merely an expression of his anger. Defendant denied being a danger to anyone and stated

---

[4] It was determined that the guns had been stolen from a local firearms store, resulting in defendant also being charged with breaking and entering, Macomb Circuit Court Case No. 05-000315-FH.

that his comments pertaining to "doom and doomsday" were, in actuality, references to a game that he played.

### I. CONSTITUTIONAL CHALLENGE

On appeal, defendant challenges the constitutionality of MCL 750.543m of the Michigan Anti-Terrorism Act, MCL 750.543a *et seq.*, asserting that the statute is vague and fails to provide fair notice of proscribed conduct. Because defendant did not challenge the constitutionality of the statute in the lower court, we review for plain error affecting defendant's substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999); *People v Sands*, 261 Mich App 158, 160; 680 NW2d 500 (2004).

The Michigan Anti-Terrorism Act, MCL 750.543a *et seq.*, provides, in relevant part:

> (1) A person is guilty of making a terrorist threat or of making a false report of terrorism if the person does either of the following:
>
> (a) Threatens to commit an act of terrorism and communicates the threat to any other person.
>
> (b) Knowingly makes a false report of an act of terrorism and communicates the false report to any other person, knowing the report is false.
>
> (2) It is not a defense to a prosecution under this section that the defendant did not have the intent or capability of committing the act of terrorism.
>
> (3) A person who violates this section is guilty of a felony punishable by imprisonment for not more than 20 years or a fine of not more than $20,000.00, or both. [MCL 750.543m.]

The phrase "act of terrorism" is defined in MCL 750.543b(a) as

> a willful and deliberate act that is all of the following:

(*i*) An act that would be a violent felony under the laws of this state, whether or not committed in this state.

(*ii*) An act that the person knows or has reason to know is dangerous to human life.

(*iii*) An act that is intended to intimidate or coerce a civilian population or influence or affect the conduct of government or a unit of government through intimidation or coercion.

### A. VAGUENESS

Defendant initially contends that MCL 750.543m(1)(a) violates his right to due process of law[5] because it is unconstitutionally vague. *People v Hill*, 269 Mich App 505, 524 n 8; 715 NW2d 301 (2006). Specifically, defendant asserts that MCL 750.543m is overbroad and infringes First Amendment freedoms because, in criminalizing the making of a threat, the statute does not require either an overt act to effectuate the threat or the communication of the threat to the intended victim. Additionally, defendant argues that, because the statute fails to define the term "threat," the statutory language is too indefinite to be constitutionally sound.

To determine whether a statute is unconstitutional, "the entire text of the statute should be examined and the words of the statute should be given their ordinary meanings." *Hill, supra* at 524. Statutes are presumed to be constitutional, and a statute is to be construed in a constitutional manner unless the unconstitutionality of the statute is facially obvious. *Id.* at 525. Statutes that criminalize pure speech "must be interpreted with the commands of the First Amendment clearly in mind." *Watts v United States*, 394 US 705, 707; 89 S Ct 1399; 22 L Ed 2d 664 (1968). "To minimize infringement on our

---

[5] US Const, Am XIV; Const 1963, art 1, § 17.

fundamental interest in free expression, 'a state statute which regulates speech and expression must be narrowly drawn so as not to infringe on constitutionally protected speech.' " *People v Cervi,* 270 Mich App 603, 621; 717 NW2d 356 (2006), quoting *People v Taravella,* 133 Mich App 515, 519; 350 NW2d 780 (1984). What constitutes an otherwise valid governmental regulation may be deemed unconstitutional if it "sweeps so broadly as to impinge upon activity protected by the First Amendment." *Dandridge v Williams,* 397 US 471, 484; 90 S Ct 1153; 25 L Ed 2d 491 (1970). However, First Amendment protections are not absolute and the United States Supreme Court has recognized the permissibility of governmental regulation of certain categories of speech without violating an individual's right to free expression, such as statements deemed to comprise "true threats." *Virginia v Black,* 538 US 343, 358-359; 123 S Ct 1536; 155 L Ed 2d 535 (2003).

" 'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Id.* at 359. "The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats 'protect[s] individuals from the fear of violence' and 'from the disruption that fear engenders,' in addition to protecting people 'from the possibility that the threatened violence will occur.' " *Black, supra* at 359-360, quoting *RAV v City of St Paul,* 505 US 377, 388; 112 S Ct 2538; 120 L Ed 2d 305 (1992).

It is a recognized principle of statutory construction that the words contained in a statute are not to be construed in a void, but rather are meant to be read together to harmonize the meaning and give effect to the act as a whole. "Accordingly, statutory language

should be read in the context of the entire act." *People v Conley*, 270 Mich App 301, 317; 715 NW2d 377 (2006). The language of MCL 750.543m, in conjunction with the statutory definitions contained within MCL 750.543b(a), serve to preclude "[i]ntimidation in the constitutionally proscribable sense of the word" consistent with the communication of a "true threat." *Black, supra* at 360. Specifically, MCL 750.543m(1)(a) criminalizes the "making [of] a terrorist threat" by threatening to "commit an act of terrorism" and the communication of that "threat to any other person." An "act of terrorism" is defined as a "willful and deliberate act" that would comprise a "violent felony," known to be "dangerous to human life," and that "is intended to intimidate or coerce a civilian population or influence or affect the conduct of government . . . through intimidation or coercion." MCL 750.543b(a). Given the plain and ordinary meaning of these terms, we are satisfied that the statutory provisions, when read together, prohibit only "true threats," as they encompass the communication of a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. *Black, supra* at 359. Further, because the statutes require the existence of an intent to "intimidate or coerce," they extend beyond the type of speech or expressive conduct that is afforded protection by the First Amendment. As such, the statutes are neither unconstitutionally vague nor overbroad.

Our determination that the threats referenced within the statute are restricted and encompass only "true threats" is further bolstered by the existence of MCL 750.543z, which provides: "Notwithstanding any provision in this chapter, a prosecuting agency shall not prosecute any person or seize any property for conduct

presumptively protected by the first amendment to the constitution of the United States in a manner that violates any constitutional provision."

Hence, the reference to threats in MCL 750.543m prohibits only "true threats," thus rendering the challenged statute facially valid.

Defendant further contends that the statute is unconstitutionally vague because the term "threat," which is not directly defined in the statute, is too indefinite. A statute is deemed to be sufficiently definite if its meaning can be fairly ascertained by using, among other methods, "the commonly accepted meanings of words." *People v Noble*, 238 Mich App 647, 652; 608 NW2d 123 (1999). Although the Michigan Anti-Terrorism Act fails to define the term "threat," the word should be construed in accordance with its ordinary meaning. MCL 8.3a.

Because the term "threat" constitutes " 'neither an unusual nor esoteric word; nor does the statute use the term in an uncommon or extraordinary context,' " the meaning of the word is easily ascertainable and can be gleaned from the statute and the accompanying definitions. *People v Russell*, 266 Mich App 307, 311; 703 NW2d 107 (2005), quoting *People v Denmark*, 74 Mich App 402, 408; 254 NW2d 61 (1977). The meaning of the term "threat" can be understood to encompass only true threats, i.e., a communication of a serious expression of intent to commit an act of unlawful violence. See MCL 750.543z. It is absolutely clear from the context in which the term "threat" appears that the Legislature sought to prevent the communication of an intent to engage in behavior that constituted or encompassed an "act of terrorism" as defined by MCL 750.543b. This intent is especially clear given the context and meaning of the words that "threat" is directly associated with in

defining an "act of terrorism." Accordingly, the statute is not unconstitutionally vague because it is sufficiently definite to prevent arbitrary and discriminatory enforcement. Further, limiting the application of the statute to encompass only "true threats" provides fair notice of conduct that can be proscribed constitutionally. *Noble, supra* at 652.

Defendant also asserts that an intent to intimidate is necessary for a statement to be construed as a true threat. It is widely recognized that " '[t]rue threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Black, supra* at 359, quoting *Watts, supra* at 708. However, "[t]he speaker need not actually intend to carry out the threat." *Black, supra* at 359-360. Accordingly, the only intent that the prosecution had the burden to prove was defendant's general intent to communicate a "true threat." *Id.* Typically it is a question of fact for a jury to determine whether a statement constitutes a true threat. *United States v Daughenbaugh,* 49 F3d 171, 173 (CA 5, 1995).

Our conclusion that true threats need not include an intent for direct intimidation of a specific victim is supported by the fact that fear of violence to others can engender disruption similar to the disruption engendered by fear of violence to oneself. Hence, true threats of violence fall outside First Amendment protections even in the absence of direct victim intimidation. See *RAV, supra* at 388. As in this instance, even those threats not intended to be conveyed to the potential victim can be criminalized because of the state's overwhelming interest in preventing the disruption that can result from such threats.

B. NOTICE

Defendant also contends that the statute is unconstitutional because it fails to provide fair notice of what conduct it proscribes. Defendant asserts that the statutory language is confusing because, although MCL 750.543m(2) indicates it is not a defense that the defendant did not intend to carry out the threat, the definition of the phrase "act of terrorism" includes the requirement that the act be "willful," "deliberate," and "intended to intimidate or coerce a civilian population or influence or affect the conduct of government." MCL 750.543b(a). Defendant argues that the Legislature made threatening to commit an act of terrorism into a strict liability crime, which resulted in the criminalization of otherwise innocent acts, and does so without providing a clear warning to ordinary persons.

In discussing what constitutes fair notice, this Court has stated:

> To afford proper notice of the conduct proscribed, a statute must give a person of ordinary intelligence a reasonable opportunity to know what is prohibited. A statute cannot use terms that require persons of ordinary intelligence to speculate regarding its meaning and differ about its application. For a statute to be sufficiently definite, its meaning must be fairly ascertainable by reference to judicial interpretations, the common law, dictionaries, treatises, or the commonly accepted meanings of words. [*Sands, supra* at 161 (citations omitted).]

Using this guideline, the meaning of MCL 750.543m is readily ascertainable. MCL 750.543m criminalizes communicating to any other person a serious expression of intent to commit an act of terrorism. See *Black, supra* at 359. Specifically, the statute criminalizes communicating to any other person a serious expression of an intent to commit a "willful and deliberate act" that

would constitute "a violent felony" under Michigan law, which the communicator "has reason to know is dangerous to human life," and which is "intended to intimidate or coerce a civilian population or influence or affect the conduct of government." MCL 750.543b(a). Given the language and definitions of the terms used, the statute provides a person of ordinary intelligence a reasonable opportunity to know what behavior or conduct is prohibited. *Sands, supra* at 161.

II. ADMISSIBILITY OF EVIDENCE

Defendant next asserts that the trial court erred by permitting introduction of evidence that defendant possessed guns, bomb-making materials, knives, and ammunition because such evidence was not relevant to the issues to be tried and was unfairly prejudicial. "The decision whether to admit evidence is within a trial court's discretion." *People v Katt*, 468 Mich 272, 278; 662 NW2d 12 (2003). This Court will reverse the trial court's ruling on the admissibility of evidence only if the trial court abused its discretion. *Id.* An abuse of discretion will not be found if the trial court's decision is within the principled range of outcomes. *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003). Moreover, an evidentiary error does not merit reversal unless a substantial right is involved and, looking at the case as a whole, it appears that it is more probable than not that the error was outcome determinative. *People v Lukity*, 460 Mich 484, 495-496; 596 NW2d 607 (1999).

The prosecution persuaded the court that because the jury would question defendant's intent and whether he was just "fantasizing" when communicating with McGinty, the introduction of the weapons and ammunition was necessary to demonstrate that defendant intended a "true threat." The court indicated that it

would balance the admission of the weapons by permitting defendant to argue, in "fairness," that he really did not intend to carry out the threat.[6]

MCL 750.543m provides, in relevant part:

> (1) A person is guilty of making a terrorist threat or of making a false report of terrorism if the person does either of the following:
>
>> (a) Threatens to commit an act of terrorism and communicates the threat to any other person.

Minimally, the prosecution had to prove that defendant made a threat to commit an act of terrorism and that he communicated that threat to another person. Because the prosecution was not required to show that defendant intended or had the capability to carry out the threat, MCL 750.543m(2), defendant argues that the weapons and ammunition were not relevant to the elements of the crime charged and were highly prejudicial. Nevertheless, the prosecution asserts that it was required to prove that defendant's statements amounted to a true threat, which necessitated a showing that defendant intended to do something harmful. Hence, the prosecution claims that defendant's weapons cache was relevant to demonstrating that the statements to McGinty were expressions of his intent to do harm.

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of

---

[6] This aspect of the trial court's ruling makes little sense in light of the fact that the statute clearly provides that "[i]t is not a defense to a prosecution under this section that the defendant did not have the intent or capability of committing the act of terrorism." MCL 750.543m(2). Certainly, it is not "fair" to tell the defendant to argue he had no intent to carry out the threat when it would then be incumbent on the trial court to instruct the jury that such an argument is irrelevant to its determination.

consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." MRE 403. Evidence is unfairly prejudicial if it is marginally probative but there is a danger that it will be given undue or preemptive weight by the jury. *People v Knox*, 469 Mich 502, 509; 674 NW2d 366 (2004). The assessment of the prejudicial effect of evidence is " 'best left to a contemporaneous assessment of the presentation, credibility, and effect of testimony' by the trial judge." *People v Bahoda*, 448 Mich 261, 291; 531 NW2d 659 (1995), quoting *People v VanderVliet*, 444 Mich 52, 81; 508 NW2d 114 (1993), mod on other grounds 445 Mich 1205 (1994).

Notably, to be material, evidence need not relate to an element of the charged crime or an applicable defense. *People v Brooks*, 453 Mich 511, 518; 557 NW2d 106 (1996). " '[A] material fact "need not be an element of a crime or cause of action or defense but it must, at least, be 'in issue' in the sense that it is within the range of litigated matters in controversy." ' " *Id.* (citation omitted). When arrested, defendant denied having the intent to harm anyone, and indicated that his verbal behavior did not encompass a "true threat" but merely an expression of his anger and "bad talk." Thus, it was incumbent on the prosecution to demonstrate that defendant's words were not mere hyperbole, but rather comprised a "true threat." We believe that defendant's accumulation of an arsenal of weapons is material to that demonstration. In addition, the existence of the weapons bears on defendant's credibility in asserting his lack of intent to do harm and, thus, whether his

statements comprised "true threats." Therefore, because the weapons were both relevant and material, the trial court did not err in admitting them into evidence.

In addition, defendant was being tried on a felony-firearm charge. The felony-firearm charge was specifically tied to defendant's convictions for receiving and concealing stolen firearms. While defendant stipulated that he pleaded guilty to the charges of receiving and concealing stolen firearms, "[t]he prosecution must carry the burden of proving every element beyond a reasonable doubt, regardless of whether the defendant specifically disputes or offers to stipulate any of the elements." *People v Mills*, 450 Mich 61, 69-70; 537 NW2d 909 (1995), modified on other grounds 450 Mich 1212 (1995).

An individual is guilty of felony-firearm when he or she possesses a firearm when committing or attempting to commit a felony. MCL 750.227b(1). The term "firearm" is defined as "a weapon from which a dangerous projectile may be propelled by an explosive, or by gas or air." MCL 750.222(d). There is no question that the guns themselves were relevant and admissible with regard to the felony-firearm charge, because evidence was presented that the firearms in defendant's possession were those he was convicted of illegally receiving and concealing.

In addition, the pipe bombs meet the definitional requirement of firearms, in accordance with MCL 750.222(d), as constituting "a weapon from which a dangerous projectile may be propelled by an explosive." Despite the fact that the pipe bombs were incomplete because they lacked explosive powder or fuses, the prosecution need not prove that a firearm is operable to convict a defendant of felony-firearm. *People v Peals*, 476 Mich 636, 650; 720 NW2d 196 (2006). In accordance

with *Peals*, because the incomplete pipe bombs were designed and constructed as weapons from which a dangerous projectile could be propelled by explosives, they could be considered firearms and, thus, were also admissible with regard to the felony-firearm charge.

### III. JURY INSTRUCTIONS

Defendant next contends that the trial court erred by refusing to provide the jury with a constitutionally sound definition of the term "threat." Jury instructions are reviewed de novo. *People v Hubbard (After Remand)*, 217 Mich App 459, 487; 552 NW2d 493 (1996). The trial court must instruct the jury as required and appropriate. MCR 6.414(H). Jury instructions are reviewed in their entirety to determine if there was any error, and even "if the instructions are imperfect, there is no error if they fairly presented the issues to be tried and sufficiently protected the defendant's rights." *People v Milton*, 257 Mich App 467, 475; 668 NW2d 387 (2003).

The trial court instructed the jury, as follows, regarding the charge of making a threat to commit an act of terrorism:

> For this charge, the Prosecutor must prove the following elements beyond a reasonable doubt. One, the Defendant threatened to commit an act of terrorism, and two, he communicated this threat to another person. An act of terrorism is defined as follows: (A) An act that would be a violent felony, and (B) An act that the defendant knows or has reason to know is dangerous to human life, and (C) An act intended to intimidate or coerce a civilian population, or influence, or affect, the conduct of government or a unit of government through intimidation or coercion. It is not a defense to this charge of making a terrorist threat that the Defendant did not have the intent or capability of committing the act of terrorism.

We find that the trial court's provision and recitation of the elements of the charged offense served to fairly present the issues to be decided and was an adequate protection of defendant's rights. *People v Fennell,* 260 Mich App 261, 265; 677 NW2d 66 (2004).

As an issue of fact, the determination whether a statement was a true threat is generally a question for the jury. *Daughenbaugh, supra* at 173. When asked by the jury for a definition of the word "threat," despite defendant's objection, the court, using a dictionary definition, stated, "A threat would be an expression of an intention to inflict something harmful." Defendant contends that this definition is constitutionally deficient because it fails to communicate what comprises a "true threat." However, it is recognized that when a statute fails to define its own terms, "it is customary to look to the dictionary for a definition." *People v Lee,* 447 Mich 552, 558; 526 NW2d 882 (1994). Therefore, the trial court properly resorted to the use of a dictionary to provide the jury with a definition of the word "threat." Contrary to defendant's assertion, the definition provided to the jury—that a "threat" was "an expression of an intention to inflict something harmful"—is consistent with the definition of a "true threat," which encompasses statements by which a speaker communicates "a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Black, supra* at 359. Therefore, we conclude that there was no instructional error.

IV. SUFFICIENCY OF THE EVIDENCE

Defendant further contends there was insufficient evidence of a "threat" to convict him of making a terrorist threat or to convict him of using a computer to commit a threat of terrorism. We review challenges to

the sufficiency of the evidence de novo. *People v Lueth*, 253 Mich App 670, 680; 660 NW2d 322 (2002). The reviewing court must evaluate the evidence in the light most favorable to the prosecution and determine whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt. *People v Johnson*, 460 Mich 720, 723; 597 NW2d 73 (1999). Questions of credibility and intent should be left to the trier of fact to resolve. *People v Avant*, 235 Mich App 499, 506; 597 NW2d 864 (1999).

It is not entirely clear to this Court what defendant believes is lacking in his messages to McGinty to render the term "threat" inapplicable. Even if some of defendant's statements were ambiguous, that would not preclude them from constituting threats. *United States v Fulmer*, 108 F3d 1486, 1492 (1997). However, the majority of defendant's comments were not ambiguous, as exemplified by his messages that he is going to kill his family on Judgment Day, his intention to bring guns to the school (noting that "vengeance is a bitch"), and statements that he is more determined than ever to kill a specified police officer. It is also reasonable to conclude that the threatened acts of school violence, including defendant's statements that he would peek under tables and question cowering individuals why he should spare their lives, were intended to intimidate the student population and "influence or affect the conduct of . . . a unit of government." Further, defendant realized that these communications were interpreted by the recipient as a serious expression of an intent to inflict harm because of McGinty's stated reactions and defendant's decision to forgo ongoing communication with her after reading her responses. Accordingly, the messages provided ample evidence to support defendant's conviction of making a threat to commit an act of terrorism. MCL 750.543b(a); MCL 750.543m.

Moreover, MCL 752.796(1)[7] provides that "[a] person shall not use a computer program, computer, computer system, or computer network to commit, attempt to commit, conspire to commit, or solicit another person to commit a crime." Defendant does not deny the use of a computer to communicate the threats. Rather, defendant's assertion of insufficient evidence is entirely dependent on his arguments regarding the constitutionality of MCL 750.543m, the deficiency of the instructions provided to the jury, and whether there was sufficient evidence to convict defendant of violating MCL 750.543m. Because those underlying claims fail, defendant's assertion of insufficient evidence to convict him of using a computer to make a threat of terrorism must also fail.

### V. WAIVER OF *MIRANDA*[8] RIGHTS

Next, defendant contends that the trial court erred in determining that he validly waived his *Miranda* rights. In a prior appeal, this Court addressed this issue and determined that defendant's "confession was made freely and voluntarily, i.e., it was the product of an essentially free and unconstrained choice by defendant." *People v Osantowski,* unpublished opinion per curiam of the Court of Appeals, issued February 28, 2006 (Docket No. 263211), slip op at 4.

> Where a prior ruling of this Court concerns the same question of law in the same case, the doctrine of law of the case applies and the prior ruling is controlling. A legal issue raised in one appeal may not be raised in a subsequent

---

[7] We note and distinguish that defendant was not charged or convicted, pursuant to MCL 750.543p, regarding the use of a computer to commit an act of terrorism, and that our ruling neither considers nor interprets that statute.

[8] *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

> appeal after proceedings held on remand to a lower court. [*People v Stinson,* 113 Mich App 719, 730; 318 NW2d 513 (1982) (citations omitted).]

This Court previously reviewed the record of the *Walker*[9] hearing and ruled that the entirety of defendant's confession was admissible at trial. Accordingly, we decline to re-examine the alleged error in this appeal.

### VI. SUPPRESSION OF EVIDENCE

Finally, defendant contends that the trial court erred in refusing to suppress evidence procured because the search warrant used to seize evidence from his home was overbroad and lacked probable cause. On appeal from a trial court's ruling on a motion to suppress seized evidence, the trial court's findings of fact are reviewed for clear error, while its ultimate decision is reviewed de novo. *People v Davis,* 250 Mich App 357, 362; 649 NW2d 94 (2002). Appellate scrutiny of a magistrate's decision on the sufficiency of an affidavit underlying a search warrant "requires the reviewing court to ask only whether a reasonably cautious person could have concluded that there was a 'substantial basis' for the finding of probable cause." *People v Russo,* 439 Mich 584, 603; 487 NW2d 698 (1992).

A search warrant may only be issued upon a showing of probable cause. MCL 780.651(1). Probable cause to issue a search warrant exists if there is a substantial basis for inferring a fair probability that evidence of a crime is in the stated place. *People v Kamierczak,* 461 Mich 411, 418; 605 NW2d 667 (2000). The affidavit is to be read in a commonsense and realistic manner. *Russo, supra* at 604. "A search warrant must describe with

---

[9] *People v Walker (On Rehearing),* 374 Mich 331; 132 NW2d 87 (1965).

particularity the place to be searched and the persons or things to be seized." *People v Martin*, 271 Mich App 280, 303; 721 NW2d 815 (2006). How much specificity is required will vary with the circumstances and the type of items involved. *Id.* at 304. When police officers act in "objective" good faith in executing a search warrant, the items seized should not be suppressed even if the warrant is later declared invalid. *People v Goldston*, 470 Mich 523, 526; 682 NW2d 479 (2004).

The affidavit supporting the request for a search warrant provides that the place to be searched is a single-family residence located at 40894 Oakland Court in Clinton Township, and indicates that "[a] white in color four door Chrysler with Michigan license plate '4DUE59' is parked in the driveway. The vehicle is registered to Marvin Osantowski." The affidavit further provides that the affiant

> is assisting in the investigation of case #04-35518. Clinton Township Police Department received a telephone call from Officer Joe Ederer of the Washington State University Police Department in Pullman, Washington. Ofc. Ederer said his corporal's daughter has been talking on-line with Andrew Osantowski, w/m, 06-12-87. Andrew's Instant Message (IM) name is "nazi-bot-sadistic". The corporal's daughter's IM name is "dazedck00". Andrew told "dazed" he had a stolen AK. Andrew said he will kill his parents, his sister, his brother and his three cats on "judgment day". Andrew went on to say he was off school for a week because he was looking for guns. Andrew admitted he was [sic]. Andrew went on to advocate killing a large number of people at school will make him famous [sic]. Andrew described his "arsenal" Andrew said he has 14 forty (40) round magazines for one rifle, shotguns and pipe bombs. Andrew said he has homemade video of him test firing weapons, building pipe bombs and shows where he stored his arsenal. Andrew told "dazed" he had been kicked out of a catholic school and was new to his current school.

> Andrew said the detective at his school charged him with a 5-year felony. Andrew said he is "more determined then ever to blow her head off".

The affidavit fails to indicate that defendant is related to Marvin Osantowski, that Marvin Osantowski resides at the place to be searched, or that defendant is tied to the place to be searched in any other capacity or manner. The affidavit identifies the property to be seized to include: records of electronic and other communications; computer hardware; computer memory storage devices; computer software documentation; passwords necessary to gain access computer programs; electronically stored communications; proof of residency; proof of internet service provider; weapons and weapon making materials; books, videos, magazines, newsletters, and digital video disks showing bomb-building, test-firing of weapons, bomb detonation, or arsenal caches; and property stolen from Resurrection Cemetery.

Reading the affidavit in a commonsense and realistic manner, it is clear that the affidavit does not provide a substantial basis for inferring a fair probability that evidence of a crime is in the stated place. *Kamierczak, supra* at 418. While the affidavit references facts supporting a finding that a place over which defendant has control would contain evidence of a crime, the affidavit fails to tie defendant to the specific location to be searched. The fact that a car registered to someone with defendant's last name is parked at the specified location does not necessarily indicate that defendant has any connection to that place. This is true even though defendant's last name is not particularly common. The trial court concluded that it was logical to infer, because of defendant's age, that he would not have his own car or separate residence. Although that statement is true,

there remains a failure to account for the affidavit's lack of factual assertions or content to connect defendant to Marvin Osantowski, and thereby, to connect defendant to the place to be searched. Accordingly, there was no substantial basis for the finding of probable cause. *Russo, supra* at 603.

However, this transgression is minor. *Goldston, supra* at 529-530. If the affidavit had noted that Marvin Osantowski was defendant's father, then defendant would have been sufficiently linked to the location to be searched. The Clinton Township Police Department knew that Marvin Osantowski was defendant's father, as they both had been arraigned on unrelated charges the morning the search warrant was obtained and executed. In fact, the affidavit's failure in this instance is merely a good-faith oversight and not the product of police misconduct. Accordingly, the stated purpose of the exclusionary rule, to deter police misconduct, would not be served by applying the rule on the basis of the affidavit's identified deficiency. *Goldston, supra* at 530. Therefore, evidence of the items seized need not be suppressed. *Id.* at 526.

The warrant provides for the seizure of the same property identified in the affidavit. Defendant argues that the search warrant is insufficiently particularized because it indiscriminately allows for the seizure of books and other written instruments. However, the search warrant does not provide for the seizure of all books, videos, and correspondence, but only those related to bomb building and detonation, the test firing of weapons, or a cache of weapons. The list of items clearly relates to defendant's statements to McGinty that he has a video of himself test firing weapons, building pipe bombs, and showing where his "arsenal" is stored. The remaining items the police were authorized to seize

relate to the illegal possession and use of weapons and other stolen goods, which were referenced by defendant in the messages to McGinty, and the method of transmission of the alleged threats contained in the messages. Under the circumstances, the warrant provided sufficient specificity to avoid giving the executing officers unrestrained discretion in determining what items were subject to seizure. *Martin, supra* at 304.

## VII. SCORING OF MCL 777.49a

On cross-appeal, the prosecutor argues that the trial court erred in interpreting MCL 777.49a(1)(a) when scoring offense variable (OV) 20. The prosecutor contends the trial court should have scored 100 points for this variable when sentencing defendant. This Court "must affirm the trial court's sentence if it is within the appropriate guidelines range, unless the trial court made an error in scoring the sentencing guidelines or relied on inaccurate information in determining the sentence." *Babcock, supra* at 268. The proper construction of the statutory sentencing guidelines is a question of law subject to review de novo. *People v Houston*, 473 Mich 399, 403; 702 NW2d 530 (2005).

The purpose of judicial interpretation of statutes is to ascertain and give effect to legislative intent. *People v Parker*, 230 Mich App 677, 685-686; 584 NW2d 753 (1998). "If a statute is clear, it must be enforced as plainly written. However, if a statute is susceptible to more than one interpretation, judicial construction is proper to determine legislative intent. Statutory language should be construed reasonably, keeping in mind the purpose of the act." *People v Spann*, 250 Mich App 527, 530; 655 NW2d 251 (2002) (citations omitted).

MCL 777.49a provides, in relevant part:

(1) Offense variable 20 is terrorism. Score offense variable 20 by determining which of the following applies and by assigning the number of points attributable to the one that has the highest number of points:

(a) The offender committed an act of terrorism by using or threatening to use a harmful biological substance, harmful biological device, harmful chemical substance, harmful chemical device, harmful radioactive material, harmful radioactive device, incendiary device, or explosive device . . . 100 points

\* \* \*

(2) As used in this section:

(a) "Act of terrorism" and "terrorist" mean those terms as defined in section 543b of the Michigan penal code, 1931 PA 328, MCL 750.543b.

MCL 750.543b(a) defines an "act of terrorism" as

a willful and deliberate act that is all of the following:

(*i*) An act that would be a violent felony under the laws of this state, whether or not committed in this state.

(*ii*) An act that the person knows or has reason to know is dangerous to human life.

(*iii*) An act that is intended to intimidate or coerce a civilian population or influence or affect the conduct of government or a unit of government through intimidation or coercion.

In addition, MCL 750.543b(g) identifies a "terrorist" as "any person who engages or is about to engage in an act of terrorism." MCL 750.543b(h) defines "violent felony" to include "the use, attempted use, or threatened use of . . . an explosive device, or an incendiary device."

Taking the specific language of MCL 777.49a(1)(a) to score 100 points for the commission of "an act of terrorism by using or threatening to use" an "explosive

device" in conjunction with the definitions in MCL 750.543b, which recognize that the elements constituting an act of terrorism or an individual being identified as a terrorist comprise not only acts but threats to engage in precluded acts, it is clear that the trial court erred in failing to score points for OV 20. In his computer messages, defendant stated that he made a video of himself building pipe bombs and that he made an audio recording entitled "bombthreat before she blows." Later in the messages defendant also states, "START THE CLOCK NOW . . . LETS SEE WHEN THIS BOMB GOES OFF . . . I WIRED MYSELF FOR DETONATION UPON TOUCHING OF FILTHY LOVING JEWS THAT THINK THEY OWN ME." These statements support scoring 100 points under OV 20 for defendant's threatened use of an explosive device. MCL 777.49a(1)(a).

Affirmed in part, vacated in part, and remanded for resentencing. We do not retain jurisdiction.