*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

DAVID JOSEPH LENIO,

Defendant-Appellant.

UNPUBLISHED
February 14, 2019

No. 339945
Kent Circuit Court
LC No. 17-002894-FH

Before: METER, P.J., and SAWYER and CAMERON, JJ.

PER CURIAM.

Defendant, David Joseph Lenio, appeals his jury conviction of malicious use of service provided by a telecommunications service provider, MCL 750.540e. We affirm.

In February 2017, defendant used Twitter to communicate with the victim, who posted messages, or "tweets," that primarily involved political and human-rights issues. Both defendant and the victim had public Twitter profiles. Defendant's correspondence with the victim began in February 2015 when defendant responded to the victim's tweet regarding two fatal shootings at free speech events in Copenhagen, Denmark. The victim testified that defendant sent him several anti-Semitic tweets, in addition to tweets about European laws that criminalized the denial of the Holocaust. The victim testified that he saw other concerning tweets on defendant's Twitter profile, including messages in which defendant stated that he wanted to "shoot up a grade school in Kalispell, Montana," where defendant was living at the time.

Between February 2015 and February 2017, defendant moved to live with his parents in Grand Rapids, Michigan. The victim testified that defendant did not contact him in 2016. However, the victim testified that defendant sent him four direct, public tweets in February 2017. These four tweets read:

> [February 7, 2017, 6:00 p.m.] My religion says it's cool to shoot jewish people in the head with guns… You still cool with #religiousLiberty? @JonHutson

[February 7, 2017, 6:05 p.m.] Hey @JonHutson when did you stop jerking off your son? ae911truth.org[1]

[February 19, 2017, 10:35 p.m.] Jesus also used physical violence to remove the money changers from the temple but thanks for lecturing us you fucking pedo kike @JonHutson

[February 19, 2017, 10:37 p.m.] If #Trump is such a tyrant, why they hell hasnt he put @Evan_McMullin into the #GasChambers yet? No one would even care if he did. @JonHutson

The victim testified that defendant's first tweet on February 7, 2017, was in response to the victim's tweets earlier that day on religious liberty. The victim testified that defendant's tweets on February 19, 2017, were in response to the victim's post suggesting that Jesus never engaged in discrimination.

The victim testified that he was alarmed by the threatening nature of the tweets. As such, he viewed defendant's public tweets from January 2017 and February 2017 to understand the context of the tweets that were specifically addressed to him.[2] The victim also testified that he

---

[1] The victim testified that this hyperlink led to an article regarding conspiracy theories about the September 11, 2001 terrorist attacks.

[2] Defendant's other tweets from January 2017 to February 2017 that were admitted as evidence at trial are reproduced here as they appeared in the original tweets:

[January 3, 2017, 11:57 p.m.] After serving 5 months in jail without a conviction for words on twitter that should be #freeSpeech…I'm a fan of shooting sprees #ethics

[January 4, 2017, 12:03 a.m.] Each time that I'm #censored on #socialMedia, the more convinced I become that violence works best #1a #freeSpeech & #holocaust denial laws

[January 4, 2017, 12:47 a.m.] Lets just say I am more full of #hate and #rage than I have ever been; lol… Maybe that was what this system was trying to do? @Tayten5

[January 5, 2017, 1:02 a.m.] [In response to ADL New Jersey's tweet of an article titled: "Court Ruling Allowing Islamic Society of Basking Ridge to Build Mosque a Significant Victory for Religious Freedom"] My religion tells me its okay to go on shooting sprees so long as one only targets sub human jewish filth who ban #holocaust denial @ADL_NJ

[January 5, 2017, 2:24 a.m.] funny thing is #censorship only makes violence more appealing…

[January 6, 2017, 1:59 p.m.] [In response to the tweet by JacharJacobs stating: "@AlecDawson @PsychicDogTalk4 @mitchellvii holocaust deniers

reported defendant's tweets to the Kalispell Police Department in Montana and to local police authorities where he lived. He further testified that, because defendant now lived in Michigan, the Montana Police Department referred the victim's concerns to the Grand Rapids Police Department. Police officers executed a search warrant of defendant's residence in Grand Rapids and found a 12-gauge shotgun and shotgun ammunition in defendant's bedroom.

Defendant first argues that his Twitter messages do not amount to "true threats" and are constitutionally protected free speech. We disagree.

Defendant raised the issue whether his tweets constituted protected speech before the trial court in his motion to dismiss. The trial court denied defendant's motion, determining that defendant's statements on Twitter were "true threats" that were not protected by the First Amendment. Ordinarily, we review a trial court's decision regarding a motion to dismiss for an abuse of discretion. See *People v Jones*, 252 Mich App 1, 4; 650 NW2d 717 (2002). However, in this case, the trial court's resolution of defendant's motion to dismiss involved a constitutional question. As such, this Court reviews the constitutional issue de novo. See *Burns v Detroit (On Remand)*, 253 Mich App 608, 616; 660 NW2d 85 (2002); *People v Rogers*, 249 Mich App 77, 94; 641 NW2d 595 (2001).

The First Amendment of the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech[.]" US Const, Am I. The 1963 Michigan Constitution provides: "[e]very person may freely speak, write, express and publish his views on all subjects, being responsible for the abuse of such right; and no law shall be enacted to restrain or abridge the liberty of speech or of the press." Const 1963, art 1, § 5. The Michigan Supreme Court determined that the free speech protections of the Michigan Constitution and the United States Constitution are coterminous. *Book Tower Garage, Inc v Local No 415*, 295 Mich 580, 587; 295 NW 320 (1940); see also *Woodland v Mich Citizens Lobby*, 423 Mich 188, 211; 378

---

deserve to be shot on sight. My grandparents barely avoided Auschwitz"] lol that's how i feel about jewish scum, gun grabbers anyone who supports #censorship… #1a coming @JacharJacob @AlecDowson @mitchellvii

[February 10, 2017, 10:44 p.m.] Revenge is best served right after your adversaries forgot that you might be willing to do it…

[February 12, 2017, 10:22 a.m.] I want a job operating #gasChambers @Polyphemus___ @richi3baby

[February 22, 2017, 8:36 p.m.] I can be anything I want if I grow up, and I just want to man ovens in a concentration camp… "Personal #meatloaf & #spaghetti" #foodPorn

[February 22, 2017, 9:05 p.m.] I blocked someone on twitter today… for snitching. [A picture with the words "Stop. Snitching." accompanied this tweet.]

NW2d 337 (1985).  This Court may consider federal authority when determining the extent of the free speech protections under the Michigan Constitution.  *Thomas M Cooley Law Sch v Doe 1*, 300 Mich App 245, 256; 833 NW2d 331 (2013).

The First Amendment protects actual speech and symbolic or expressive conduct. *Virginia v Black*, 538 US 343, 358; 123 S Ct 1536; 155 L Ed 2d 535 (2003).  "The hallmark of the protection of free speech is to allow 'free trade in ideas'—even ideas that the overwhelming majority of people might find distasteful or discomforting." *Id*.  The First Amendment "denies a State the power to prohibit dissemination of social, economic and political doctrine which a vast majority of its citizens believes to be false and fraught with evil consequence." *Id*. (quotation marks and citations omitted).[3]  Even though the language used in the political arena is often "vituperative, abusive, and inexact," it is protected by the First Amendment.  *Watts v United States*, 394 US 705, 708; 89 S Ct 1399; 22 L Ed 2d 664 (1969).  The First Amendment even protects "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials," in light of our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open[.]" *New York Times Co v Sullivan*, 376 US 254, 270; 84 S Ct 710; 11 L Ed 2d 686 (1964).  Additionally, the United States Supreme Court has held that the federal constitution protects speech communicated over the Internet to the same extent as speech communicated through other media.  *Reno v American Civil Liberties Union*, 521 US 844, 870; 117 S Ct 2329; 138 L Ed 2d 874 (1997); see also *Thomas M Cooley Law Sch*, 300 Mich App at 256.

"The protections afforded by the First Amendment, however, are not absolute." *Black*, 538 US at 358.  The United States Supreme Court has held that government can regulate the content of speech in "limited areas" that are "of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *RAV v City of Saint Paul*, 505 US 377, 383; 112 S Ct 2538; 120 L Ed 2d 305 (1992) (quotation marks and citation omitted).  A state can also regulate speech that constitutes a "true threat." *Black*, 538 US at 359 (quotation marks and citation omitted).

A threat is "[a] communicated intent to inflict harm or loss on another or on another's property, esp[ecially] one that might diminish a person's freedom to act voluntarily or with lawful consent." *Black's Law Dictionary* (9th ed).  "True threats" are statements "where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Black*, 538 US at 359; see also *Watts*, 394 US at 708.  A state may restrict and regulate "true threats" to protect people from the possibility of violence and to protect individuals from the fear of violence.  *RAV*, 505 US at 388.

---

[3] "[A] state statute which regulates speech and expression must be narrowly drawn so as not to infringe on constitutionally protected speech." *People v Taravella*, 133 Mich App 515, 519; 350 NW2d 780 (1984).  Michigan's malicious use of service provided by a telecommunications service provider statute, MCL 750.540e, is not unconstitutionally vague or overbroad.  *Id*. at 524-525.  Additionally, MCL 750.540e sanctions the *conduct* of misuse of a communications service, rather than pure speech. *Id*. at 520 (emphasis added).

-4-

A state may ban speech that is considered a "true threat" even if the speaker does not actually intend to carry out the threat. *Black*, 538 US at 360. Intimidation constitutes a "true threat" if the "speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." *Id*. Under the speaker-oriented standard for determining whether a threat is a true threat, a statement is a "true threat" if "a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault." *United States v Schiefen*, 139 F3d 638, 639 (CA 8, 1998) (quotation marks and citation omitted).

In this case, we conclude that defendant's tweets constituted "true threats." The tweets communicated a serious expression of his intent to harm, or at least intimidate, Jewish people generally, and the victim specifically, in addition to people who supported what defendant perceived to be censorship of his freedom of speech. Defendant expressed his desire to commit acts of violence when he stated that he wanted to operate gas chambers. Defendant repeatedly encouraged violence against these groups, demonstrating his deliberate and persistent targeting of these individuals. Defendant's tweets, which referenced his persistent threats of violence and repeated expressions of hate and rage towards Jewish people demonstrated that defendant's intent to inflict harm was credible and genuine. A reasonable person viewing defendant's tweets would interpret the statements as a serious expression of defendant's intent to inflict harm. And, as discussed more thoroughly below, defendant specifically targeted the victim in this case by tagging him. Therefore, we conclude that defendant's tweets constituted "true threats" that were not constitutionally protected speech.

Defendant next argues that there was insufficient evidence of a threat necessary to support defendant's conviction for malicious use of service provided by a telecommunications service provider. We disagree.

This Court reviews de novo a sufficiency of the evidence claim. *People v Ericksen*, 288 Mich App 192, 195; 793 NW2d 120 (2010). "In determining whether sufficient evidence exists to sustain a conviction, this Court reviews the evidence in the light most favorable to the prosecution, and considers whether there was sufficient evidence to justify a rational trier of fact in finding guilt beyond a reasonable doubt." *People v Harris*, 495 Mich 120, 126; 845 NW2d 477 (2014). The appellate court is required to draw all reasonable inferences and credibility determinations in favor of the jury verdict. *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000). This is because "[j]uries, not appellate courts, see and hear witnesses and are in a much better position to decide the weight and credibility to be given to their testimony." *People v Wolfe*, 440 Mich 508, 515; 489 NW2d 748 (1992), amended 441 Mich 1201 (quotation marks and citation omitted). "Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *People v Carines*, 460 Mich 750, 757; 597 NW2d 130 (1999) (quotation marks and citation omitted).

Malicious use of service provided by a telecommunications service provider is a misdemeanor crime in which a person intends to "terrorize, frighten, intimidate, threaten, harass, molest, or annoy another person, or to disturb the peace and quiet of another person." MCL 750.540e(1). A person maliciously uses the service provided by a telecommunications service provider, in relevant part, by: "[t]hreatening physical harm or damage to any person or property in the course of a conversation or message through the use of a telecommunications service or

device." MCL 750.540e(1)(a). The focus of the statute is on the defendant's malicious intent, rather than the recipient's subjective perceptions of the defendant's conduct. *People v Taravella*, 133 Mich App 515, 521; 350 NW2d 780 (1984).

MCL 750.540e does not define the terms "threat" or "threatening." Undefined words in statutes are "construed and understood according to the common and approved usage of the language," but technical words or terms of art are given their appropriate meaning in the law. MCL 8.3a. "Where a statute does not define one of its terms it is customary to look to the dictionary for a definition." *People v Lee*, 447 Mich 552, 558; 526 NW2d 882 (1994). A threat is "[a] communicated intent to inflict harm or loss on another or on another's property, esp[ecially] one that might diminish a person's freedom to act voluntarily or with lawful consent." *Black's Law Dictionary* (9th ed). The verb "to threaten" is defined as "(1) to utter threats against; (2)(a) to give signs or warning of; (2)(b) to hang over dangerously; (3) to announce as intended or possible; or (4) to cause to feel insecure or anxious." *Merriam-Webster's Collegiate Dictionary* (11th ed). Therefore, a person threatens physical harm to another person or damage to property when he or she states that harm is intended or possible, or when the person causes another to feel insecure about his or her safety or personal situation relative to the threatening person.

The malicious use of service provided by a telecommunications service provider statute does not require that the threat is credible. The statute only requires that a defendant "intends to terrorize . . . or annoy another person" by threatening physical harm of *a* person, not necessarily a specified person, the recipient of the threat, or a class of people. There is also no requirement that a defendant's threat causes a person to feel threatened or fearful. Compare MCL 750.540e(1) (malicious use of service provided by telecommunications service provider) to MCL 750.411i (aggravated stalking).

In this case, the evidence and testimony presented at trial demonstrated that defendant maliciously used Twitter, a telecommunications provider, to terrorize, frighten, intimidate, threaten, harass, molest, or annoy the victim. Defendant's intent can be reasonably inferred from the content of the messages. Defendant's tweets to the victim implied that the victim was both a pedophile and Jewish, referring to the victim as a "pedo kike." Defendant's tweets also threatened physical violence, specifically stating he would like to "shoot [J]ewish people in the head with guns" and utilize gas chambers. A jury could reasonably infer that defendant's references to violence against Jewish people would target the victim by association on the basis of defendant's reference to the victim as a "pedo kike." As such, a jury could infer that defendant meant to threaten and intimidate, or at least frighten and annoy, the victim. Additionally, these tweets occurred during three separate evenings within a 12-day period. A rational jury could find that defendant intended to disturb the victim's peace and quiet by sending the victim four tweets in which defendant used offensive, ethnoreligious slurs and threatened violence. See MCL 750.540e(1); see also *Taravella*, 133 Mich App at 521.

Further, the evidence and testimony presented at trial demonstrated that defendant maliciously used Twitter by threatening physical harm to a person. Defendant's tweets, read in context, provided sufficient evidence of his intent to harm Jewish people and people who, in defendant's opinion, supported the censorship of free speech. In his public tweets that did not address the victim directly, defendant referred to shooting on sight "[J]ewish scum, gun grabbers,

and anyone who supports []censorship" and beheading Jewish people. Defendant stated that he wanted to work in a concentration camp and operate gas chambers. Additionally, defendant expressed that he was "full of []hate and []rage" and that censorship made violence more appealing. A rational jury could find that defendant's repeated references to acts of violence, his possession of a gun and ammunition, and public expression of his increasing hate and rage demonstrated the requisite intent to harm an individual belonging to any of the groups that defendant named. See *People v Osantowski*, 274 Mich App 593, 605, 612-613; 736 NW2d 289 (2007) (concluding that the defendant's statements of intent to inflict harm on people other than the recipient of the statements constituted threats, even though the class of victims was ambiguous), rev'd in part on other grounds 274 Mich App 593 (2008). Viewing the evidence in the light most favorable to the prosecution and drawing all reasonable inferences in favor of the jury verdict, we conclude that there was sufficient evidence to justify the jury's finding that defendant was guilty of malicious use of service provided by a telecommunications service provider.

Affirmed.


/s/ Patrick M. Meter
/s/ David H. Sawyer
/s/ Thomas C. Cameron