NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0180n.06

Case No. 16-5007

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Mar 23, 2017
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| CLIFFORD LEON HOUSTON, | ) | TENNESSEE |
| aka Leon Houston, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

_____/

Before: MERRITT, KETHLEDGE, and WHITE, Circuit Judges.

**MERRITT, Circuit Judge.** Defendant-Appellant Clifford Leon Houston appeals his conviction of transmitting a threat to injure his attorney in violation of 18 U.S.C. § 875(c).[1] On appeal, Houston first challenges the district court's jury instructions because they did not require the Government to prove that he knew that the communication at issue would be transmitted "in interstate commerce." Alternatively, he argues that the United States did not produce sufficient evidence to justify a conviction under 18 U.S.C. § 875(c). For the reasons articulated below, we **AFFIRM** the judgment of the district court.

---

[1] The text of 18 U.S.C. § 875(c) reads: "Whoever transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than five years, or both." Throughout this opinion, we refer to the element that the communication be transmitted "in interstate or foreign commerce" as § 875(c)'s "jurisdictional element."

# I. Background

This is Houston's second appeal before this court in this case. In his first appeal, this court reversed Houston's conviction due to a defective jury instruction and remanded for further proceedings. *United States v. Houston*, 792 F.3d 663, 670 (6th Cir. 2015). Houston was again convicted after a new trial, and he now appeals from his latest conviction. Because the proof offered at the subsequent trial was substantially identical to the proof offered at the first trial, we rely upon the earlier panel's statement of relevant facts:

> Clifford Houston is not unacquainted with law enforcement or criminal defense lawyers. His most recent round of trouble began in 2006, when Houston participated in a shoot-out that ended with the death of a sheriff's deputy and his ride-along. Facing first-degree and felony murder charges, Houston obtained the services of an attorney, James F. Logan. To secure payment for Logan's representation, Houston's father executed a deed of trust on the family property, granting Logan an interest in the Houstons' land. The first trial ended in a mistrial, the second in an acquittal. Houston was not as grateful as one might expect. He did not pay his fees. That prompted Logan to foreclose on part of the Houston property, making the attorney and client neighbors and making the client unhappy.
>
> It was not long before Houston was back in jail, this time awaiting trial on a firearms offense. While in jail, Houston heard that Logan had visited his family's property (now partly Logan's property), and did not take it well. As overheard by an official from the Blount County Sheriff's Office, Houston went into "a complete rage." The official heard Houston say something about "killing them all." Then, in a variation on Shakespeare's often-misinterpreted dictum, he said: "When me and my brother get out, we're going to go to that law firm and kill every last one of them." The next day, Houston placed a phone call to his girlfriend, Pat Honeycutt. Here is part of what he said:
>
>> HOUSTON: I'll kill that motherf[* * *]er [referring to Logan] when I get out. Hey, I ain't kidding! I ain't akidding! They can record it! They can do whatever the hell they want! That motherf[* * *]er opens up my house, I'll kill his ass! When I get out of this motherf[* * *]er, he's dead!
>> . . .
>> HOUSTON: The only thing [Logan]'s gonna get from me is a f[* * *]ing bullet! That's the only thing that son of a b[* * * *] gonna get from me! That's the only damn thing! They better get somebody to lock that son of a b [* * * *] up! 'Cause I've got

> something for Mr. damn Logan! You let me get out of this motherf[* * *]er in any shape, form, or fashion, and he's got a damn problem!
>
> . . .
>
> HOUSTON: You tell any of my family, you tell Cody, you tell Rachel, any of them, to kill that son of a b[* * * *]! . . . Any of my, any of my people has got my permission to kill that son of a b[* * * *]!
>
> HONEYCUTT: They ain't gonna do that. I mean, they ain't gonna shoot nobody.
>
> HOUSTON: Well, I ain't got no damn problem with it. I ain't got no damn problem with it.

*Id.* at 665-66 (internal citations omitted). Further, Houston told Honeycutt:

> I want you to get in the news . . . . I want people to know that son of a b[* * * *] don't own nothin'. He ain't sellin' nothin', and whoever buys it, they just throw'd their money in the damn wind! Because I'm comin' home, and I'm goin' to my property, and whoever's there, they got a damn problem!

A few additional facts from the second trial are necessary to properly understand Houston's claims in this appeal. First, the United States put on proof that Houston's call to Honeycutt was routed from the jail where he was being held pre-trial to a computer server in Louisiana and then back to Tennessee as part of the jail's contract for provision of telephone services to inmates; Houston was unaware that his calls to Honeycutt were routed out of the State of Tennessee. Second, stickers on the inmate telephones made clear that the calls could be recorded and that jail officers could listen in on inmates' conversations.

A jury convicted Houston of violating 18 U.S.C. § 875(c) after his first trial, but this court reversed that conviction because the trial judge's jury instructions ran afoul of the Supreme Court's decision in *Elonis v. United States*, 135 S. Ct. 2001 (2015). *Houston*, 792 F.3d at 667. We then remanded the case for retrial. *Id.* at 670.

At his second trial, Houston argued that § 875(c), as interpreted by the Supreme Court in *Elonis*, requires the United States to prove that he knew that his communication was

transmitted "in interstate commerce." The district court rejected this argument and provided the jury with the following instruction on the jurisdictional element of the offense: "To transmit something in interstate commerce merely means to send it from a place in one state to a place in another state. The government is not required to prove that the defendant actually knew that the communication would be transmitted across state lines." The jury again convicted Houston of making a threat in violation of 18 U.S.C. § 875(c).

This appeal followed.

## II. Analysis

Houston raises three claims on appeal. First, he argues that the district court misapplied *Elonis* when it instructed the jury that the United States was not required to prove that Houston knew the phone calls in question would be transmitted across state lines. Second, he argues that the United States failed to produce sufficient evidence to support the jury's conclusion that his statements amounted to a "true threat" as required under 18 U.S.C. § 875(c). Finally, he argues that the Government failed to produce sufficient evidence to justify the jury's finding that his communications ever actually crossed state lines. For the reasons stated below, we reject each of these arguments and affirm the judgment of the district court.

### A. *No* Mens Rea *Requirement for the Jurisdictional Element*

Houston first claims that the district court's jury instructions incorrectly stated that the United States was not required to prove any culpable mental state with respect to § 875(c)'s jurisdictional element. We review challenges to jury instructions only for abuse of discretion. *United States v. Eaton*, 784 F.3d 298, 306 (6th Cir. 2015). Since Houston challenges the district court's interpretation of the statute, we ask whether the instruction issued by the district court "fails accurately to reflect the law." *United States v. Rios*, 830 F.3d 403, 431 (6th Cir. 2016)

(quoting *United States v. Ross*, 502 F.3d 521, 527 (6th Cir. 2007) (internal quotation marks omitted)).

The plain text of § 875(c) offers no guidance on the question of the mental state that must be proven in order to secure a conviction. Indeed, the Supreme Court only recently clarified the requisite *mens rea* with respect to the "threat" element of that statute. *Elonis*, 135 S. Ct. at 2012. While the *Elonis* Court did not discuss the *mens rea* requirement applicable to § 875(c)'s jurisdictional element, long-settled law relieves the prosecution from any obligation to prove that the defendant was aware of the facts giving rise to federal jurisdiction unless those facts are relevant to "separating legal innocence from wrongful conduct."[2] *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72-73 (1994); *United States v. Feola*, 420 U.S. 671, 673 n.1, 676-79, 676 n.9, 685 (1975). This court has applied that principle to the jurisdictional elements of several federal criminal statutes. *See United States v. Baird*, 403 F. App'x 57, 63 (6th Cir. 2010) (possessing stolen goods); *United States v. Chambers*, 441 F.3d 438, 450 (6th Cir. 2006) (transporting child pornography). And other circuits have done the same with the specific statute at issue here. *United States v. Whiffen*, 121 F.3d 18, 23 (1st Cir. 1997), *abrogated on other grounds by Elonis*, 135 S. Ct. 2001; *United States v. Darby*, 37 F.3d 1059, 1067 (4th Cir. 1994), *abrogated on other grounds by Elonis*, 135 S. Ct. 2001.

Houston's conduct was no more or less "wrongful" because his communication crossed state lines. Had Houston's phone call remained entirely within the State of Tennessee, he would still have been subject to prosecution in state court. *See* Tenn. Code Ann. § 39-17-308 (criminalizing knowing threats made over the telephone). Unlike the threat element at issue in *Elonis*, the jurisdictional element of § 875(c) does nothing to separate "legal innocence from

---

[2] Congress obviously retains authority to expressly condition criminal liability on the defendant's knowledge of the facts supporting federal jurisdiction. *See Feola*, 420 U.S. at 676-79, 676 n.9. No such express requirement, however, appears in § 875(c).

wrongful conduct." *X-Citement Video*, 513 U.S. at 73. Houston's words became criminal once he spoke them with knowledge that they would be perceived as a "true threat." *See Elonis*, 135 S. Ct. at 2012; *United States v. Alkhabaz*, 104 F.3d 1492, 1495 (6th Cir. 1997), *abrogated in part by Elonis*, 135 S. Ct. 2001. The route the words took once they left his mouth is only relevant to determine where, not if, he would be subject to prosecution. *See Feola*, 420 U.S. at 685 ("The concept of criminal intent does not extend so far as to require that the actor understand not only the nature of his act but also its consequence for the choice of a judicial forum."). Accordingly, we hold that the district court's jury instructions were proper because conviction under § 875(c) does not require any showing that Houston knew that his communications would be routed across state lines.

### B. Sufficient Evidence Supports Houston's Conviction

Houston also argues that the evidence against him is insufficient to justify his conviction under § 875(c) on two grounds. First, he claims that the United States failed to prove that his statements rose to the level of a "true threat." Second, he claims that the United States failed to present sufficient evidence to justify the jury's finding that his statements actually traveled in interstate commerce.

When reviewing a challenge to the sufficiency of the evidence supporting a jury conviction, we view the facts in the light most favorable to the prosecution and ask whether "*any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.*" *Houston*, 792 F.3d at 669 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (internal quotation marks omitted)). We hold that the evidence presented at trial was sufficient to justify the jury's findings on both questions.

1. Houston's Statements Were "True Threats"

Houston argues on appeal that no rational jury could have found that his statements to Honeycutt amounted to a "true threat" against Logan since Honeycutt did not interpret his words as a serious threat. Viewed in context, ample evidence supports the finding that Houston's words were a serious expression of his intent to physically harm Logan in order to stop him from exercising control over various pieces of land. Accordingly, we do not disturb the jury's finding that Houston's statements amounted to a "true threat."

"True threats" enjoy no protection under the First Amendment. *Virginia v. Black*, 538 U.S. 343, 359 (2003) (citing *Watts v. United States*, 394 U.S. 705, 708 (1969) (per curiam)). A statement rises to the level of a "true threat" when it amounts to "a serious expression of an intention to inflict bodily harm" and is "conveyed for the purpose of furthering some goal through the use of intimidation." *Alkhabaz*, 104 F.3d at 1495. A statement need not be communicated to the targeted individual in order to constitute a "true threat." *See id.* For example, in *United States v. Jeffries*, the defendant posted a video to YouTube threatening a judge and shared that video with twenty-nine Facebook users, but not the judge. 692 F.3d 473, 477 (6th Cir. 2012), *abrogated in part by Elonis*, 135 S. Ct. 2001. We affirmed the defendant's conviction, and in doing so, approved the district court's instruction that "it [was] not relevant that [the judge] even viewed the communication." *Id.*

The record makes clear that Houston told his girlfriend that he wanted Logan dead. Specifically, he made the following statements about his intentions towards Logan over the phone: "I'll kill that motherf[* * *]er." "The only thing [Logan]'s gonna get from me is a f[* * *]ing bullet." "When I get out . . . he's dead!" "[A]ny of my people has got my permission to kill that son of a b[* * * *]!" All the while, he assured his girlfriend of his seriousness of

purpose, saying, "I ain't akidding!  They can record it!"  Further, Houston's tone during the call reflects an intense and visceral anger toward Logan that a reasonable jury could interpret as indicating that Houston sincerely intended to kill Logan.

That evidence was supplemented by the testimony of a prison guard who stated that, the day before the recorded phone call, he overheard Houston, alone in his jail cell, say, "When me and my brother get out, we're going to go to that law firm and kill every last one of them."  The guard further testified that Houston made this and similar statements in a tone conveying "absolute rage."  A reasonable jury could take this as further evidence that Houston was serious when he made threats in his phone conversation with Honeycutt the following day.

Houston argues that his statements were not "true threats" under § 875(c) since the recipient, Honeycutt, did not believe that he would follow through on his statements.  A reasonable jury could find that Houston's statements amounted to a threat against Logan. Houston stated that he wanted to kill Logan as soon as he got out of jail and that he did not care who heard him saying so, knowing full well that his call was being recorded.  He instructed his girlfriend to tell his family members to shoot Logan on sight if Logan appeared on the property. Houston also told his girlfriend that he wanted the recording of their call played in court, and that she should get his dispute with Logan "in the news" in order to deter prospective buyers with knowledge that they would have "a damn problem" with Houston once he was released.  A jury could reasonably conclude that Houston intended his threats to influence Logan or others through intimidation, and therefore that Houston made a "true threat."  *Alkhabaz*, 104 F.3d at 1495.  While it is not clear from the record that Houston's girlfriend actually doubted whether Houston would follow through on his threats,[3] that fact is irrelevant here because a statement can

---

[3] On appeal, Houston suggests that his statements were not "true threats" under § 875(c) because Honeycutt "did not believe [them] to be a serious threat."  Appellant Br. at 29.  That characterization of their interactions is not entirely

be found to be a "true threat" even if the defendant lacks the ability to make good on his promised aggression. *See United States v. Glover*, 846 F.2d 339, 344 (6th Cir. 1988).

The available evidence was sufficient to permit a reasonable jury to conclude that Houston's statements evinced a serious intent to inflict bodily harm upon Logan and that those statements were uttered in order to intimidate Logan into surrendering his lawful possession of various pieces of real property. Accordingly, we uphold the jury's verdict that Houston's statements amounted to "true threats" under § 875(c).

### 2. Houston's Communication Traveled in Interstate Commerce

Finally, Houston attacks the sufficiency of the evidence supporting the jury's finding that his communication was transmitted in interstate commerce. Unrebutted testimony indicates that the phone call at issue was routed from Tennessee to Louisiana and then back to Tennessee as part of the jail's contract for provision of inmate telephone services. Contrary to Houston's assertions on appeal, an employee of the phone service contractor indicated on both direct and cross-examination that computer servers in Louisiana actually placed the call to Houston's girlfriend in Tennessee after verifying that his account contained sufficient funds to pay for the call. Accordingly, we affirm the jury's finding that the statements at issue were transmitted in interstate commerce.

### III. Conclusion

We hold that the United States had no obligation to prove that Houston knew that his threats would be transmitted "in interstate commerce" to convict Houston of violating 18 U.S.C. § 875(c). We further hold that there was sufficient evidence to justify the jury's findings that

---

accurate. While it is true that Honeycutt said, "They ain't gonna do that. I mean, they ain't gonna shoot nobody," that was a response to Houston's request that she tell his family to shoot Logan. The statement does not necessarily mean that Honeycutt did not believe that Houston's threats to kill Logan himself were not serious.

Houston's statements were "true threats" and that they were transmitted in interstate commerce.

Accordingly, we **AFFIRM** the judgment of the district court.