NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name:  19a0594n.06
Case Nos. 18-1576/1608/1695

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

KIMBERLEY THAMES,                                 )
                                                  )
   *Plaintiff-Appellee/Cross-Appellant*,          )
                                                  )
        **v.**                                 )      **ON APPEAL FROM THE**
                                                  )      **UNITED STATES DISTRICT**
**CITY OF WESTLAND**, *et al.*,                   )      **COURT FOR THE EASTERN**
                                                  )      **DISTRICT OF MICHIGAN**
   *Defendants-Appellants/Cross-Appellees*.      )

**FILED**
Dec 06, 2019
DEBORAH S. HUNT, Clerk

Before:  BOGGS, BATCHELDER, and BUSH, Circuit Judges.

      **ALICE M. BATCHELDER, Circuit Judge.**  In this interlocutory appeal, four police officers, in their individual capacities, appeal the district court's denial of qualified immunity from claims of false arrest, retaliatory arrest in violation of freedom of speech and religion, and denial of equal protection.  The plaintiff cross-appeals the denial of her motion for summary judgment on those claims and separately appeals the grant of summary judgment to the City and its Police Chief, certified for appeal under Federal Rule of Civil Procedure 54(b).  We AFFIRM in part, REVERSE in part, and REMAND for entry of judgment consistent with this opinion.

**I.**

      On Saturday morning, August 27, 2016, Kimberley Thames, a 57-year old, Roman Catholic, pro-life activist, stood with three other people—an elderly woman who appeared to be a Catholic nun, and a wheelchair-bound man with his wife—on the public sidewalk outside Northland Family Planning, an abortion clinic.  Thames was holding a two-foot-by-two-foot sign with a photo and handwritten words, advocating pro-life beliefs and protesting abortion.  While

many Northland Clinic employees knew Thames as an occasional protestor, the Clinic's security guard, Robert Parsley, apparently did not. He was standing somewhere near her when she engaged him in conversation, beginning with her offer that she was praying for him and praying that he would find a different job. But, at some point, there was discussion of bombs. Thames said that Parsley raised the topic of bombs, telling her that there had been bombings and threats at abortion clinics, but Parsley says that Thames initiated it and said something like: "I prophesy bombs are going to fall and they're going to fall in the near future"; "I prophesy bombs are going to fall and they're going to fall on you people"; and "bombs, bombs on America, and bombs will blow up this building."

At the end of this conversation, Thames left in her car (she says to use a restroom) but Parsley reported Thames's statements to a clinic employee, Mary Guilbernat, who immediately called 911. The dispatcher sent four City of Westland police officers to the Clinic: John Gatti, Jason Soulliere, Adam Tardif, and Sergeant Norman Brooks.[1] These are the defendants here.

When Thames returned to resume her protesting, the police were there. Officer Gatti had arrived first and interviewed Parsley and Guilbernat. Both identified Thames as the person who made the statements. Parsley also told Officer Gatti that Thames fled when he tried to take her photo, saying: "I tried to make contact [with Thames] via photo. . . . [M]ost of them they don't mind getting photoed, but she has a problem with giving me a photo."[2] When Officer Soulliere approached Thames and asked if she had made a bomb threat, Thames denied it but would not tell Officer Soulliere what she *had* said to Parsley; instead, she talked around Officer Soulliere's questions, repeating that she had not made any threat, objecting that she did not know what she

---

[1] Another officer, John Halaas, arrived on-scene at some point and participated in Thames's arrest and the search of her car. Thames cites a rude comment that Officer Halaas made, but she did not name him in the lawsuit.

[2] In the police cruiser after her arrest, Thames was recorded on the dashcam video saying, unprompted: "He [Parsley] was trying to take a picture of me and I didn't want him to do that."

could have said that Parsley had misconstrued, and blaming Parsley, saying that he had first mentioned bombings at abortion clinics.

| | |
|---|---|
| Souilliere: | Did you tell someone there was going to be a bombing? |
| Thames: | Noo-oh. . . . I didn't say anything like that. |
| Soulliere: | Well there's several cops coming this way so I need to know why you said what you said - - and what you said. |
| Thames: | Uh, I think you should ask him [Parsley] because I think he's misrepresenting something that I must have said. I certainly - - |
| Soulliere: | Well what did you say? |
| Thames: | I didn't say that. |
| Soulliere: | Well, what *did* you say? |
| Thames: | I didn't say *that*. |
| Soulliere: | Well, I understand that. |
| Thames: | I didn't say that. I don't really know. |
| Soulliere: | But what did you say? |
| Thames: | What would I have said that would have made him [Parsley] say such a thing? |
| Soulliere: | Well, I don't know. That's why we're here to investigate because he said that you said there is going to be a bombing. |
| Thames: | I *did not* say that. |
| Soulliere: | This is a pretty serious threat. |
| Thames: | Right, and I think, I think he [Parsley] has an issue. |
| Soulliere: | So, what did you say to him? |
| Thames: | I didn't say that. I wasn't - - |
| Soulliere: | Ma'am, I understand that you didn't say that to him. But what did you say? Can we get to the bottom of this? |
| Thames: | I do not know. I do not know. |
| Soulliere: | Ok, you don't know what you said to him? |
| Thames: | I do not know what he's referring to. Period. I do not know. |
| Soulliere: | Well what did you *say* to him? |
| Thames: | I didn't really say anything. |
| [The nun walked over to intervene in this conversation.] | |
| Nun: | Why don't you have them both come together? Why don't you call them both here? |
| Thames: | Do I need an attorney? Because - - |

3

| | |
|---|---|
| Soulliere: | Or you can just talk to me about what happened. |
| | . . . [some repeated denials, rebuttals, and talking over each other] |
| Soulliere: | Alright, well you won't even tell me what you said to him, so - - |
| Thames: | It wasn't something for me to say that could be misconstrued. |
| Soulliere: | Well, I've already explained to you what we've been called here for - - |
| Thames: | I understand and it's a false call, sir. |
| Soulliere: | Well, you won't even tell me what you said to him. |
| Thames: | There is nothing I said that should be even misconstrued as such. |

During this continued exchange, Thames explained to the officers that no one else had heard her conversation with Parsley. That is, clinic employee Mary Guilbernat did not hear the conversation with Parsley, but more importantly, Thames said that the nun did not actually hear it either.

Based on Parsley's accusation, including his written statement, and Thames's evasiveness with Officer Soulliere, Sergeant Brooks, the senior officer at the scene, ordered Thames arrested for making a terrorist threat in violation of M.C.L. § 750.543m, the section of the "Michigan Anti-Terrorism Act" titled "Making Terrorist Threat or False Report of Terrorism." Sergeant Brooks testified at his deposition in this case about his reasoning for the arrest:

| | |
|---|---|
| Question: | Are you aware that . . . at the scene, according to the video and Officer Gatti's testimony, the complaining witness [Parsley] says [that Thames said], 'I prophesy bombs, I prophesy bombs are going to fall and they're going to fall in the near future'? |
| | . . . |
| | And what does the complaining witness [Parsley] say in that written statement that my client [Thames] allegedly said? |
| | . . . |
| Brooks: | [Reading the written statement:] She said, 'Bombs, bombs on America and bombs will blow up this building.' |
| Question: | Those aren't the same words he [Parsley] told to Officer Gatti [at the scene] as far as you understand; is that right? |
| Brooks: | I don't know the exact verbiage that - - that he [Parsley] said to Officer Gatti. My - - there's only one word that concerns me in this whole thing and that's 'bombs.' Just like you can't yell 'fire' in a crowded theater, you can't say anything about bombs near a facility that performs abortions. |

4

When this questioning continued:

> Question: So what was the information - - back up - - was the information that Officer Gatti relayed to you [regarding Parsley's accusations that Thames had threatened a bombing] - - was that your basis for ordering the - - directing the arrest of my client [Thames]?
>
> Brooks: The information that I was provided by Officer Gatti [i.e., Parsley's report of Thames's statements], and then Officer Soulliere also - - I talked to him briefly, and he was advising me that your client [Thames] was being very evasive and not answering any questions concerning her conversation with the security guard [Parsley].
>
> Question: What specifically was the information that you relied on to direct the arrest of my client?
>
> Brooks: Well, as I just stated, the information from Officer Gatti that the security guard had been told by her [Thames] that there was going to be bombs dropped or placed or somehow bombs were going to affect that facility and the fact that Officer Soulliere said that she [Thames] basically refused to say anything to him in regards to the conversation she and the security guard had. She was being very evasive.

Later in this deposition, Thames's attorney asked Sgt. Brooks about the fact that, while recording the events at the scene, one of the officers' field microphones recorded Brooks saying: "Anybody who has anything to do with this whole thing, they're fanatics." Sgt. Brooks answered that he was not referring to any one side of the abortion debate and that he meant a "fanatic" as just being someone who is extremely zealous on a certain topic—that is, he claimed that he was not favoring either position but meant both sides of the abortion issue were "fanatics." Thames has argued that this comment is proof of Brooks's animus against her beliefs and the motive for her arrest.

Back at the scene: when Officer Soulliere arrested and handcuffed Thames, she sought assistance from the nun, who intervened, claiming she had not heard Thames make any bomb threat, implied that Parsley was lying, and then harangued Soulliere, Gatti, and Brooks because they were not arresting the clinic's owner and employees for "killing God's children," were instead protecting "a Nazi concentration camp," and were "wrong" and "evil" for "abid[ing] by the Supreme Court's law" rather than "God's law." Eventually, Officer Gatti, clearly frustrated, retorted to the nun: "You shouldn't be in the position you are. You're a disgrace."

Meanwhile, Officer Halaas was called away to another location and had to remove Thames from his cruiser to Soulliere's cruiser. The video revealed his aggravation:

| | |
|---|---|
| Halaas: | [To Thames:] Alright, come on out [of Officer Halaas's cruiser]. I've got to put you in a different car. |
| Thames: | (inaudible) |
| Halaas: | Ma'am, we've already told you twice, for terroristic threats. . . . Hey, who's in [car number] 16, she's going in 16. |
| Thames: | May I ask what's going to happen to me? |
| Halaas: | Yeah, you're gonna go to jail. |
| Thames: | Do I get an attorney? Do I get to call anyone? |
| Halaas: | You'll get one free phone call. You'll get an attorney after you've been arraigned (inaudible) boy or a girl, however it works out. Have a seat. You'll get a - - |
| Thames: | What about my, will I (inaudible) |
| Halaas: | [Shouting] Have a seat! I've gotta go! |
| Nun: | [Yelling from distance] You've got the wrong person. |
| Halaas: | [Shouting at Thames] Get in! |
| Nun: | You have the wrong person. |
| Halaas: | [Shouting] Ma'am, I don't give a shit! I've gotta go! |

Concurrently, Officers Soulliere and Halaas searched Thames and her car, incident to her arrest, but did not find any explosives or other contraband. The officers did not evacuate the Clinic or the surrounding area, nor did they conduct a search of the Clinic, the adjacent parking lot, or a nearby dumpster. They did not contact the Michigan State Police to request bomb sniffing dogs. They did not impound Thames's car. At his deposition, Sergeant Brooks explained:

| | |
|---|---|
| Question: | There were no like bomb dogs, sniffing dogs that came to sniff to see if there was anything in the panels or interior of [Thames's] vehicle; is that right? |
| Brooks: | We would have been searching for evidence, not necessarily a bomb. |
| Question: | Did anybody search the surrounding vicinity of the Northland Family Planning Clinic for any contraband or a bomb? |
| Brooks: | At that - - at that point we were not concerned about a bomb being physically there at that particular time because of the amount of protesters and employees and patients of the clinic. The reason we were sent there was because of the [verbal] threat [by Thames]. |

6

> Question: If you thought the threat was credible, would you not want to evacuate the building?
>
> Brooks: Threat doesn't have to be credible according to the law.

After arresting Thames, Officer Soulliere drove her to the Westland police station, booked her, and placed her in a holding cell where she remained over the weekend. None of the on-scene officers had any further contact with her or involvement in her arrest or detention. When she was released on Monday morning at 10:14 a.m., she had been in police custody for about 49 hours. The holding cell had a bunk for sleeping and a toilet, but Thames did not sleep or use the toilet. The jail's custody officers brought her food, but she did not eat. The custody officers did not offer Thames an opportunity to attend mass or receive the Eucharist on Sunday.

A sergeant at the police station had approved Officer Soulliere's arrest report that Saturday but not until after Detective Jerry Farrar, the on-call detective that weekend, had ended his shift. On Sunday morning, Det. Farrar was directed immediately to a homicide investigation and, therefore, did not address Thames's case until Monday morning. At that point, Det. Farrar interviewed Thames, who waived her right to an attorney and insisted that she had not made a bomb threat. Det. Farrar determined that Parsley's written statement did not amount to "a direct threat where [Thames] threatened to bomb the clinic," and concluded that, "[e]ven though there was probable cause to arrest [Thames,] I find at this time there is insufficient evidence to charge her with a crime," so he decided to release her.

The Police Department conducted an internal investigation. It concluded that the arrest was "reasonable and justified," and was consistent with its policies, practices, and procedures. The report criticized Officer Halaas for saying "I don't give a shit," Sgt. Brooks for engaging in the political and religious argument at the scene, and Officer Gatti for saying "you're a disgrace" to the nun. The Police Chief, Jeff Jedrusik, accepted the report's findings. He reprimanded Officer Gatti, and cautioned Officer Halaas and Sgt. Brooks. Deputy Chief Brian Miller, the representative

for this lawsuit, testified during his deposition that the arrest and detention of Thames in this instance were consistent with the Department's policies and practices.

Thames brought a § 1983 suit against the four on-scene officers, the Police Chief, and the City of Westland, claiming false arrest, violation of her rights to free speech and free exercise of religion (including a claim of retaliatory arrest), violation of her right to equal protection, and *Monell*-based supervisory and municipal liability.[3] The officers sought qualified immunity on the individual-capacity claims and the Chief and the City moved for summary judgment on the official-capacity claims. Thames moved for a summary-judgment ruling that all defendants were liable on all claims. Although Thames denied making any threat or initiating the discussion of bombs, she agreed that she conversed with Parsley, that Parsley reported his version of that conversation to the police, and that the subsequent on-scene interactions with the responding officers were recorded and are admitted in this litigation. Moreover, and essential here, Thames has deliberately pressed her claims, and her arguments in this appeal, *as if she made the statements as Parsley represented*, effectively admitting Parsley's accusation of what she said—or conceding any dispute about it—and arguing only that those statements, considered in context, would not be sufficiently threatening to establish probable cause for her arrest. She has therefore insisted that there are no material facts in dispute and the only question here is whether, as a matter of law, her statements as reported by Parsley and the events in the recordings establish probable cause.[4]

---

[3] Thames had also named the Clinic, its CEO, and the employee who called 911, but the district court dismissed those defendants and Thames has not appealed that judgment. Thames had named the security guard as a "John Doe" defendant but, after learning his name, never amended her complaint or served him with process. The district court dismissed the John Doe defendant (i.e., Parsley) and Thames has not appealed that judgment.

[4] Thames asserts this most clearly and emphatically in her final brief, in which she says: "Based on the undisputed material facts, there are no statements attributed to [Thames] that qualify as a '*true threat*' as a matter of law." Thames's Reply Br. at 3. "Because there is no dispute as to any material fact, this appeal raises pure questions of law. . . . [T]he Officer Defendants do not have to 'concede' any facts in this appeal because there is no dispute of *any* material fact. . . . [T]his case only raises issues of law for the [c]ourt to decide." Reply Br. at 1. "Put another way, both [sides] agree that there are no factual inferences left for the fact-finder to draw that could affect the outcome; [the two sides] differ only as to the legal consequences that follow from those undisputed facts." Reply Br. at 2.

8

The district court reviewed the audio and video recordings, heard argument from counsel, and denied both sides' motions for summary judgment on the false-arrest claim by holding that the controlling question—whether the officers had probable cause to arrest Thames—was a disputed question of material fact for a jury. The court also denied both sides' motions for summary judgment on the free-speech, free-exercise, and equal-protection claims for two of the officers, reserving those claims for a jury, but granted qualified immunity to the other two officers, finding that Thames had no evidence to support the claims against those officers. Finally, the court granted summary judgment to the Chief and the City, finding that Thames had not asserted, nor could she prove, a pattern, policy, or specific action necessary for *Monell*-based liability claims. *See Thames v. City of Westland*, 310 F. Supp. 3d 783 (E.D. Mich. 2018).

The officers filed an interlocutory appeal, challenging the denial of qualified immunity (No. 18-1576). Thames cross-appealed (No. 18-1608), challenging the denial of her motion for summary judgment on liability. Finally, Thames sought and received from the district court a Rule 54(b) certification allowing her to appeal immediately the summary judgment for the Chief and the City (No. 18-1695). We consolidated the three appeals into this one.

## II.

This is an interlocutory appeal in which the defendant officers and the plaintiff, Thames, challenge the district court's denial of their competing motions for summary judgment, based on qualified immunity and liability, respectively. Thames also challenges the grant of summary judgment to the Police Chief and the City. We must establish our jurisdiction for all three.

---

Moreover, in her Response to this court's show-cause order, Thames said: "The critically important point is that the factual dispute concerning *whether Thames actually made the statements is not material*. What *is* material to the resolution of this case is that no statement attributed to Thames qualifies as a true threat as a matter of law. Accordingly, those statements cannot provide probable cause for her arrest."

**A.**

The denial of summary judgment is ordinarily not a final decision within the meaning of 28 U.S.C. § 1291, and, accordingly, it is generally not immediately appealable. But the "denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of [] § 1291 notwithstanding the absence of a final judgment." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). Our jurisdiction is, however, limited: "we may not decide a challenge aimed solely at the district court's determination of the record-supported evidence, but we may decide a challenge with any legal aspect to it, no matter that it might encroach on the district court's fact-based determinations." *Bunkley v. City of Detroit*, 902 F.3d 552, 560 (6th Cir. 2018). Under our pragmatic approach, we "excise the prohibited fact-based challenge so as to establish jurisdiction." *Id.* In so doing, "we follow the same path as did the district court—considering the sufficiency of the plaintiff's proffered evidence, drawing all reasonable inferences in the plaintiff's favor—and, ideally, we would need look no further than the district court's opinion for the pertinent facts and inferences." *Id.* (citation omitted). But we are not limited to only those facts and inferences; rather, we must make our legal determination "based on th[e] now (for this purpose) undisputed record facts." *Id.* (citations omitted).

Proceeding in this manner, we have jurisdiction over this interlocutory appeal from the denial of qualified immunity. Moreover, in deciding this "purely legal" question, we can rely on Thames's stipulation that Parsley's recitation of her statements was true, and our own plenary review of the videotape recordings. *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007) ("The Court of Appeals . . . should have viewed the facts in the light depicted by the videotape.").

**B.**

Thames has correspondingly appealed the denial of her motion for summary judgment, in which she sought a determination of liability on the same claims (and facts) on which the officers

sought qualified immunity. "[U]pon establishing interlocutory jurisdiction over the qualified-immunity aspect of the appeal, we are frequently presented with questions of our pendent appellate jurisdiction." *Bunkley*, 902 F.3d at 561 (citations omitted). In such cases, "[p]endent appellate jurisdiction may be exercised only when the immunity issues absolutely cannot be resolved without addressing the nonappealable [pendent] issues." *Id*. (alterations in original, citation omitted). Here, the question of the officers' liability is so completely intertwined with the claims of qualified immunity that we find that one necessarily resolves the other and establishes pendent appellate jurisdiction.

## C.

Thames also appeals the grant of summary judgment to the Police Chief and the City on her *Monell* claims. Ordinarily, rulings that do not dispose of all parties and all claims do not end the action and are, therefore, not immediately appealable. But if the district court "expressly determines that there is no just reason for delay," it may "direct entry of a final judgment as to one or more, but fewer than all, claims or parties." Fed. R. Civ. P. 54(b); *Libertarian Party of Ohio v. Husted*, 808 F.3d 279, 280 (6th Cir. 2015) (a Rule 54(b) order "make[s] a non-appealable order an appealable judgment"). We therefore have jurisdiction over this appeal.

## III.

Qualified immunity shields government officials in the performance of discretionary functions from standing trial for civil liability unless their actions violate clearly established rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The plaintiff in a § 1983 action against such an official bears the burden of overcoming the qualified-immunity defense. *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 681 (6th Cir. 2013). At the summary-judgment stage, the plaintiff must show that (1) the defendant violated a constitutional right and (2) that right was clearly established. *Id*. at 680. At a minimum, this

requires evidence of a "genuine issue of fact"; that is, "evidence on which [a] jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## A.

The district court denied the summary-judgment motions by both the defendant officers and Thames based on its belief that the determination of whether Thames's statements were "true threats" was a question for the jury. All parties contend that this belief was wrong.

The police arrested Thames on a violation of a Michigan statute titled "making a terrorist threat," which is codified as a specific provision of Michigan's Anti-Terrorism Act and says:

> (1) A person is guilty of making a terrorist threat or of making a false report of terrorism if the person does either of the following:
>
>    (a) Threatens to commit an act of terrorism and communicates the threat to any other person[, or]
>
>    (b) Knowingly makes a false report of an act of terrorism and communicates the false report to any other person, knowing the report is false.
>
> (2) It is not a defense to a prosecution under this section that the defendant did not have the intent or capability of committing the act of terrorism.
>
> (3) [This] is . . . a felony punishable by imprisonment for not more than 20 years or a fine of not more than $20,000, or both.

M.C.L. § 750.543m. In 2007, in a case challenging the constitutionality of this statute—on a claim that it was vague or overbroad—the Michigan Court of Appeals held it constitutional:

> [This statute] prohibit[s] only 'true threats' as they encompass the communication of a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. Further, because the statutes require the existence of an intent to 'intimidate or coerce,' they extend beyond the type of speech or expressive conduct that is afforded protection by the First Amendment. As such, the statutes are neither unconstitutionally vague nor overbroad.

*Michigan v. Osantowski*, 736 N.W.2d 289, 298 (Mich. Ct. App. 2007) (citing *Virginia v. Black*, 538 U.S. 343, 359 (2003), for the meaning of "true threat"), *rev'd for resentencing*, 748 N.W.2d 799 (Mich. 2008). As defined here, "true threats" are "statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Id.* at 297 (quoting *Black*, 538 U.S. at 359). Two caveats.

First, although this holding limits the statute to only true threats, the statute also includes "false reports" of true threats, M.C.L. § 750.543m(1)(b). And, "the defendant [need] not have the intent or capability of committing the" true threat, *id.* at § (2). This latter provision is why Sgt. Brooks and the other officers asserted at their depositions that, as they understand the law, the "[t]hreat doesn't have to be credible."

In this case and this appeal, we proceed on the understanding that Thames made certain statements to Parsley, something like: "I prophesy bombs are going to fall, they're going to fall in the near future, they're going to fall on you people, and on America, and bombs will blow up this building." Thames does not dispute the content of these statements but contends that, even if she said that, it does not rise to the level of a "true threat." Nor does Thames dispute that Parsley was both *alarmed enough* that he reported this immediately to Guilbernat, who immediately called 911, and *sincere enough* that he repeated his accusations to the responding officers, identified Thames at the scene (and directed the officers to her), and swore out a written statement. While Thames is correct that a listener's subjective fear alone is not enough to turn an innocuous statement into a true threat (via a "heckler's veto"), Parsley's response is still meaningful. Four other facts bear mention. One, Thames said "bombs." She did not threaten brimstone, or God's fiery wrath, or something that might be considered overzealous proselytizing—she said "bomb." Two, she approached and said it, discreetly, *to the security guard*—she did not say it to staff passing by, or patients, or bystanders—and she did not say it where anyone else could hear her. Three, following this conversation, Thames refused to let Parsley photograph her and, without explanation to Parsley, immediately got into her car and drove off. She did return, but not until after the police had arrived. And, finally, when questioned, Thames emphatically denied making any bomb threat, but she was actively evasive and unwilling to tell Officer Soulliere what she *had* said to Parsley, even though Soulliere asked multiple times and stressed to her the importance of her answer.

The fundamental dispute here is whether the officers had probable cause to arrest Thames for her statements, but more specifically whether Thames's statements were "true threats." In a simplified sense, if they were "true threats," the officers had probable cause to arrest Thames and they win; if not, they arrested Thames without probable cause and she wins. Both sides insist this is not a question of fact for a jury but a strictly legal decision for the court. They are wrong.

"The jury determines whether a statement is a true threat." *United States v. Hankins*, 195 F. App'x 295, 301 (6th Cir. 2006); *Osantowski*, 736 N.W.2d at 302 ("As an issue of fact, the determination whether a statement was a true threat is generally a question for the jury."); *accord Michigan v. Pilette*, No. 266395, 2006 WL 3375200, at *7 (Mich. Ct. App. Nov. 21, 2006); *cf United States v. Houston*, 683 F. App'x 434, 438 (6th Cir. 2017). Because Thames's false-arrest claim turns on this disputed question of fact for the jury to decide, the district court properly denied her motion for summary judgment on that claim. But whether that claim survives for trial is dependent on whether the officers are entitled to qualified immunity. And qualified immunity is different.

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments . . . ." *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (citations omitted). "This accommodation for reasonable error exists because officials should not err always on the side of caution because they fear being sued." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quotation marks and citations omitted). Therefore, the qualified-immunity question does not require a decision that the statements were or were not true threats, but only a determination of whether the officers' (even mistaken) belief that the statements were true threats was unreasonable. Moreover, because the dashcam videos provide the relevant facts, the panel does not need to defer to the district court's fact finding or construe inferences in favor of the non-moving party (Thames); the

14

panel can decide for itself whether "the events recorded on the tape justified the officers' conduct." *See Plumhoff v. Rickard*, 572 U.S. 765, 775 (2014).

Because Thames does not raise as a genuine issue of material fact whether she made the statements as Parsley represented, but only contends that those statements could not be true threats, we accept here that she forewarned of a bombing of the Clinic building in the near future. She initiated the conversation with Parsley, the security guard, and, though perhaps coincidentally, made the statements to him when and where no one else could hear them. Afterwards, she refused Parsley's attempts to photograph her and immediately drove off, which was reported to the police even though she did return, explaining that she had gone to use the restroom. Parsley reacted as if he believed her, prompting the call to 911, identifying and accusing her for officers at the scene, and completing a written statement. *See France v. Lucas*, 836 F.3d 612, 626 (6th Cir. 2016) ("An eyewitness identification will constitute sufficient probable cause unless there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation." (editorial marks and citation omitted)). And we see for ourselves in the video Thames's evasiveness and refusal to answer the direct and repeated question of what she had alternatively said to Parsley. *See District of Columbia v. Wesby*, 583 U.S. --, 138 S. Ct. 577, 587 (2018) (a "suspect's untruthful and evasive answers to police questioning could support probable cause" (quotation marks and citation omitted)). Based on this, Sgt. Brooks's decision to arrest Thames for making a true threat was not unreasonable.

The officers were entitled to qualified immunity on Thames's false-arrest claim.

**B.**

The district court granted qualified immunity to Officers Soulliere and Tardif on Thames's free-speech (retaliatory arrest), freedom-of-religion, and equal-protection claims, but denied

qualified immunity to Sgt. Brooks and Officer Gatti on these claims. The district court also denied Thames's motion for summary judgment on these claims. Both sides appeal.

In *Lozman v. City of Riviera Beach*, 585 U.S. --, 138 S. Ct. 1945, 1951 (2018), the Supreme Court granted certiorari to consider whether the existence of probable cause necessarily bars a First-Amendment-based retaliatory-arrest claim, but ultimately determined that it need not—and therefore would not—answer that question, and declined to set the test for proving a retaliatory-arrest claim in the ordinary course, *id.* at 1955. Despite its sidestepping the issue, the Court made a significant ruling and the *Lozman* opinion controls the analysis here.

The Court identified two potentially applicable tests: the *Hartman* test, which requires that "a plaintiff alleging a retaliatory prosecution must show the absence of probable cause for the underlying criminal charge . . . [or else] the case ends," *id.* at 1952 (discussing *Hartman v. Moore*, 547 U.S. 250, 265-66 (2006)); and the *Mt. Healthy* test, which allows a plaintiff to prevail by showing that the retaliation was the "but-for cause" of the governmental action (i.e., the arrest), regardless of the existence of probable cause, *see id.* at 1952 (discussing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285-87 (1977)). The Court opined on the relative pros and cons of the two tests before changing the question.

> The City's argument here is that, just as probable cause is a bar in retaliatory prosecution cases [under *Hartman*], so too should it be a bar in this case, involving a retaliatory arrest. There is undoubted force in the City's position. There are on average about 29,000 arrests per day in this country. In deciding whether to arrest [a suspect], police officers often make split-second judgments. The content of the suspect's speech might be a consideration in circumstances where the officer must decide whether the suspect is ready to cooperate, or, on the other hand, whether he may present a continuing threat to interests that the law must protect.
>
> For these reasons retaliatory arrest claims, much like retaliatory prosecution claims, can present a tenuous causal connection between the defendant's alleged animus and the plaintiff's injury. That means it can be difficult to discern whether an arrest was caused by the officer's legitimate or illegitimate consideration of speech. And the complexity of proving (or disproving) causation in these cases creates a risk that the courts will be flooded with dubious retaliatory arrest suits.

> [T]here are [also] substantial arguments that *Hartman*'s framework is inapt in retaliatory arrest cases, and that *Mt. Healthy* should apply without a threshold inquiry into probable cause. For one thing, the causation problem in retaliatory arrest cases is not the same as the [prosecution] problem identified in *Hartman* . . . . [I]n retaliatory prosecution cases, the causal connection between the defendant's animus and the prosecutor's decision to prosecute is weakened by the presumption of regularity accorded to prosecutorial decision-making. That presumption does not apply in [the arrest] context. In addition, there is a risk that some police officers may exploit the arrest power as a means of suppressing speech.

*Id*. at 1953 (quotation marks and citations omitted). The *Lozman* Court held that, on the unique facts of that case, "*Mt. Healthy* provides the correct standard for assessing a retaliatory arrest claim," *id.* at 1955, but it refused to displace *Hartman* or to establish *Mt. Healthy* as the only test for assessing a retaliatory arrest claim, due to the foreseeable "difficulties that might arise if *Mt. Healthy* [were] applied to the mine run of arrests made by police officers," *id*. at 1954. The Court considered only these two tests and did not suggest the possibility of any other test.

Applying *Hartman* to the present facts, beginning with the officers' reasonable belief that they had probable cause (as established above) for this run-of-the-mine arrest, Thames's failure to disprove probable cause necessarily defeats her claims that the officers are liable for wrongfully arresting her as retaliation for exercising her First Amendment rights to free speech and religion by protesting at the Clinic. Even using the *Mt. Healthy* test, Thames's claim fails because she has no evidence to show that the alleged retaliation was the "but-for cause" of her arrest. Given that none of the other protesters were arrested, particularly the far more effectively antagonistic nun, the officers' comments at the scene (i.e., Officer Halaas's hostile shout of "I don't give a shit," Sgt. Brooks's expression of his opinion that "anybody who has anything to do with this thing is a fanatic," and Officer Gatti's insult to the nun, calling her a "disgrace") do not demonstrate that they would not have arrested Thames "but for" her anti-abortion protesting. Rather, they arrested her for making what they reasonably accepted as being a bomb threat and for behaving in an evasive manner during the investigation of it.

17

Thames next claims that, aside from the alleged retaliation, the officers—by arresting her—also violated her First Amendment rights to free speech and free exercise of religion by removing her from the public sidewalk in front of the Clinic. This claim presupposes the accuracy of Thames's contention that they arrested her because she was engaging in protected First Amendment activity. That is incorrect. The officers arrested her because they reasonably believed that she made an illegal bomb threat. That is speech that is not protected by the First Amendment. The possibility or likelihood that Thames would have been engaged in protected First Amendment activities had she not been arrested is irrelevant. Had the police arrested her for anything from jaywalking to murder, they would also have removed her—as they would remove any similarly arrested person—from the public sidewalk, without regard to her intent or desire to exercise her otherwise constitutionally protected right to speak, pray, or proselytize on that sidewalk at that time. This claim does not allege a constitutional violation.

Thames next claims that the officers and the City violated her right to the free exercise of religion because, while detaining her, they prevented her from attending mass and receiving the Eucharist on Sunday. Thames has no evidence that the arresting officers had any involvement in the duration or conditions of her detention *after* her arrest, and the record shows that they did not. Moreover, Thames has provided no pertinent legal authority to support her claim that she has a First Amendment free-exercise right to religious visits or receiving of the Eucharist during short-term (weekend) detention following arrest and pending arraignment.

Thames also raised an equal-protection claim on the basis that the officers did not arrest Parsley for saying "bomb" but arrested her for saying "bomb," contending that this was solely because she was exercising her fundamental First Amendment right to protest abortion. "To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff disparately as compared to similarly situated persons and that such disparate treatment

either burdens a fundamental right, targets a suspect class, or has no rational basis," with "the threshold element" being "disparate treatment." *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (quotation marks and citations omitted). But Parsley was neither protesting nor making threats; he was on the job as a security guard. Thames was not similarly situated to Parsley. Moreover, Thames was not similarly situated to the other protesters, such as the nun (who argued with and harangued the officers), because those other protesters did not vocalize any bomb threat. There is no "fundamental right" to make a bomb threat. It was because of the bomb threat that the police arrested Thames but not the other protesters. There is a rational basis for differentiating between people who voice bomb threats and everyone else.

Thames alternatively argues that she "was arrested because she was pro-life" and "[t]he very basis for the arrest [was] Defendant Brooks'[s] assertion that a pro-lifer cannot utter the word 'bomb' outside of an abortion center." But Sgt. Brooks did not say that a "*pro-lifer*" cannot use the word "bomb" outside an abortion clinic, he said "you" cannot, without any specification as to whether "you" would be pro-life, pro-choice, pro- or con- anything. More importantly, abortion protesters are not a protected class. *Norton v. Ashcroft*, 298 F.3d 547, 559 (6th Cir. 2002). And, as just established, Thames was not similarly situated to anyone who was treated differently.

The on-scene officers are entitled to qualified immunity on these claims. The district court was correct in denying summary judgment to Thames and it was correct in granting summary judgment and/or qualified immunity to Officers Soulliere and Tardif. But the district court erred in denying qualified immunity to Sgt. Brooks and Officer Gatti on these claims.

## C.

Thames argues that the district court erred by granting summary judgment to the Police Chief and the City, in their official capacities, on her claims of supervisory and *Monell* liability. Thames contends that the City and the Police Chief are liable because the officers acted pursuant

to City policy and the Chief ratified their actions, thus effectuating the policy. But because the officers did not violate any of Thames's constitutional rights, the policies or ratification are irrelevant, and Thames cannot hold the City or the Chief liable. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the [policy, practice, or custom] might have authorized the [action] is quite beside the point."); *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 404 (6th Cir. 2010) ("Because the individual defendants did not violate his constitutional rights under the First Amendment, Vereecke cannot rely on their conduct to establish . . . municipal liability.").

The district court's grant of summary judgment to the City and the Chief was proper.

**IV.**

For the foregoing reasons, we REVERSE the judgment of the district court denying qualified immunity, AFFIRM the judgment of the district court denying summary judgment to Thames and granting summary judgment to the City and Chief, and REMAND for entry of an order consistent with this opinion.