*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

WILSON THOMPSON BYCZEK,

        Defendant-Appellant.

FOR PUBLICATION
May 6, 2021
9:10 a.m.

No. 350341
Iron Circuit Court
LC No. 18-009728-FH

Before: BOONSTRA, P.J., and GADOLA and TUKEL, JJ.

GADOLA, J.

Defendant appeals on delayed leave granted his convictions of threatening an act of terrorism, MCL 750.543m(1), and malicious use of a telecommunications service, MCL 750.540e. Defendant was sentenced as a fourth-offense habitual offender, MCL 769.12, to serve a prison term of 7 to 30 years for making a terrorist threat, and to serve a concurrent sentence of 68 days for malicious use of a telecommunications service, with credit for 68 days served. We affirm.

## I. FACTS

This case arises from a statement defendant made to a sheriff's deputy during a telephone conversation. On October 12, 2017, defendant called the Iron County Sheriff's Department for the purpose of obtaining a police report. Defendant had been seriously injured two years earlier while performing excavation work at Lac O'Seasons Resort in Iron River; defendant sustained a broken hip, a crushed pelvis, and dislocation of his other hip. Although not diagnosed with a brain injury, family members testified that the injuries affected defendant's memory and ability to work. At the time that defendant called the Iron County Sheriff's Department, defendant had a civil lawsuit pending against the resort regarding his injuries and had been urged by his attorney to obtain the police report regarding the 2015 accident.

-1-

Iron County Sheriff's Deputy Adam Schiavo testified that he answered the telephone call from defendant while he was on duty on October 12, 2017.[1]  Deputy Schiavo testified that defendant identified himself and explained that he had been injured at Lac O'Seasons Resort in 2015, and that he had not been able to recover money from them.  Deputy Schiavo testified that defendant asked for a police report from the 2015 accident, and Schiavo told defendant that he needed to file the proper paperwork.  According to Schiavo, defendant seemed agitated and was speaking very quickly and "rambling."  Schiavo testified that defendant indicated he was on the west coast but was on his way back to Michigan, and that if he did not get the money owed to him he was going to return to Michigan and "take care of it himself, and that it was going to be hashtag Las Vegas."[2]  Deputy Schiavo testified that he did not remember at what point defendant said, "Okay, I'll take care of it myself," and agreed that defendant could have been referring to completing the paperwork.  Schiavo testified that defendant hung up after he said "hashtag Las Vegas."

Less than two weeks before the telephone call, a widely-publicized shooting had occurred in Las Vegas.[3]  Deputy Schiavo testified that when defendant said "hashtag Las Vegas," he determined that defendant was referencing the Las Vegas shooting, and considered defendant's statement to be a threat directed to Lac O'Seasons Resort.  Schiavo testified that defendant did not specifically mention the Las Vegas shooting, did not say that he was going to shoot anyone, did not indicate that he had a gun or other weapon, and did not state that he was angry with anyone.  After locating the source of defendant's call as Spokane, Washington, Schiavo determined that there was no immediate danger to Lac O'Seasons Resort.  Schiavo contacted Randy and Nancy Schauwecker, the managers and part-owners of the resort, and informed them of the telephone call and that it constituted a possible threat.

Nancy Schauwecker testified that she and her husband, Randy, manage and live at Lac O'Seasons Resort, and that she is an owner of the resort.  Nancy confirmed that while defendant was doing excavation work at the resort in 2015, the ditch where he was working collapsed and he was seriously injured.  She further testified that she had not had any contact with defendant, and that defendant had not directly threatened her or the resort.

---

[1] Deputy Schiavo is the only person who heard the telephone call; the call was not recorded and no transcript or notes from the call were made.

[2] The word hashtag is defined in connection with use on social media websites as "a word or phrase preceded by a hash mark (#), used within a message to identify a keyword or topic of interest and facilitate a search for it."  A secondary definition is "a word or phrase preceded by a hash mark (#) or by the word *hashtag*, used to add wit or emphasis to a spoken or written statement." Dictionary.com <http://www.dictionary com/browse/hashtag> (accessed December 7, 2020).

[3] On October 1, 2017, a gunman fired over 1,100 rounds of ammunition from a hotel room into a crowd attending a concert in Las Vegas, Nevada, killing 58 people and injuring over 800 others. History.com Editors, Gunman Opens Fire on Las Vegas Concert Crowd, <https://www.history.com/this-day-in-history/2017-las-vegas-shooting> (accessed December 7, 2020).

Randy Schauwecker testified that he knew defendant because he had taught defendant as a seventh-grade student. Randy testified that after defendant was injured at the resort, defendant filed multiple claims against the resort and there was a pending lawsuit. Randy testified that defendant had contacted him after the accident and had been polite and apologetic about suing the resort for damages. Randy testified that defendant never directly communicated any threats of terrorism to him.

Defendant's mother, Starr Adank, testified that defendant and his girlfriend, Amery Saylor, moved to Spokane, Washington in August 2017. On October 11, 2017, she spoke with defendant who told her he was returning to Michigan. During the conversation, Adank encouraged defendant to call the police to find out if there was a police report regarding the 2015 accident. Adank testified that defendant later told her he called to try to get a police report but had become frustrated talking to the deputy. Regarding defendant's use of the phrase "hashtag Las Vegas," Adank testified that defendant often traveled to Las Vegas and used that term to mean "I'm going to Las Vegas again." Adank testified that defendant in fact went to Las Vegas on November 3, 2017, before he returned to Michigan.

Crystal Falls Sheriff's Lieutenant Ryan Boehmke testified that he listened to a phone conversation between defendant and Adank on December 9, 2017. During the conversation, defendant explained that during the October 12, 2017, phone call he had asked to file a complaint against Lac O'Seasons, and had said "they're going to pay for what they did to me,' " and "I am coming back to Michigan. I'm going to handle this on my own" or "handle this myself" and then, before hanging up had said, "Now it's hash tag Las Vegas."

Defendant's brother, Todd Byczek, testified that defendant told him that he had made "some kind of threat to Iron County, where, you know, a threat for mass shooting and referenced Las Vegas." Todd also testified that he had gone to Las Vegas with defendant in November 2017, but that the trip had been planned "kind of last second" on approximately October 31, 2017.

Todd's wife, Elizabeth Byczek, testified that defendant and Saylor began living with her and Todd in Washington in August or September 2017. Elizabeth testified that defendant was frustrated about his lawsuit against Lac O'Seasons Resort and believed that he was owed money by the resort. She testified that on October 12, 2017, defendant told her that he had called the Iron County Sheriff's Department; he appeared embarrassed and mentioned that he had lost his temper and made a threat by referencing the recent mass shooting in Las Vegas. Elizabeth testified that, to her knowledge, defendant did not have a trip planned to Las Vegas on October 12, 2017; rather, Elizabeth planned a trip for the two couples to Las Vegas for November on October 30, 2017. The e-mail confirmation of the four plane tickets purchased by Elizabeth on October 31, 2017, was admitted into evidence. Elizabeth testified that she, Todd, defendant, and Saylor traveled to Las Vegas on November 3, 2017, and returned on November 6, 2017.

FBI Special Agent David Whitlow testified that he assisted in the investigation and that he interviewed defendant. During the interview, defendant admitted that he had called the Iron County Sheriff's Department on October 12, 2017, and had said "something to the effect of, 'You don't know what people are thinking, like that guy in Las Vegas.' " Whitlow testified that defendant explained that he had been agitated and in hindsight wished he would have chosen his words more carefully. Whitlow conducted a cursory review of defendant's cell phone and

bedroom and did not find any weapons or anything that led Whitlow to believe that there was an imminent threat of danger.

After a jury trial, defendant was convicted of threatening an act of terrorism, MCL 750.543m(1), and malicious use of a telecommunications service, MCL 750.540e. The trial court thereafter sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to serve a prison term of 7 to 30 years for making a terrorist threat, and to serve a concurrent sentence of 68 days for malicious use of a telecommunications service, with credit for 68 days served. Defendant now appeals.

## II. ANALYSIS

Defendant contends that there was insufficient evidence to convict him under MCL 750.543m(1) of threatening an act of terrorism because the prosecutor failed to present evidence that he made a threat. Defendant similarly contends that there was insufficient evidence to support a conviction of malicious use of a telecommunications service under MCL 750.540e(1)(a). Defendant argues that the jury's conclusion that his use of the term "hashtag Las Vegas" was a threat is not supported by the record and thus is insufficient to support the verdict. We disagree.

## A. STANDARD OF REVIEW

This Court reviews de novo a challenge to the sufficiency of the evidence. *People v Speed*, 331 Mich App 328, 331; 952 NW2d 550 (2020). In determining the sufficiency of the evidence, we view the evidence in the light most favorable to the prosecution to determine whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt. *People v Harris*, 495 Mich 120, 126; 845 NW2d 477 (2014). In doing so, we draw all reasonable inferences and make credibility choices in support of the verdict. *People v Oros*, 502 Mich 229, 239; 917 NW2d 559 (2018). We also review de novo issues of statutory interpretation. *Speed*, 331 Mich App at 331.

## B. THREAT OF ACT OF TERRORISM

The Michigan Anti-Terrorism Act, MCL 750.543a *et seq.*, provides in § 543m, MCL 750.543m, as follows:

(1) A person is guilty of making a terrorist threat or of making a false report of terrorism if the person does either of the following:

(a) Threatens to commit an act of terrorism and communicates the threat to any other person.

(b) Knowingly makes a false report of an act of terrorism and communicates the false report to any other person, knowing the report is false.

(2) It is not a defense to a prosecution under this section that the defendant did not have the intent or capability of committing the act of terrorism.

-4-

(3) A person who violates this section is guilty of a felony punishable by imprisonment for not more than 20 years or a fine of not more than $20,000.00, or both.   [MCL 750.543m.]

Section 543b of the act, MCL 750.543b, defines the terms "act of terrorism," "dangerous to human life," and "violent felony" as follows:

As used in this chapter:

(a) "Act of terrorism" means a willful and deliberate act that is all of the following:

      (*i*) An act that would be a violent felony under the laws of this state, whether or not committed in this state.

      (*ii*) An act that the person knows or has reason to know is dangerous to human life.

      (*iii*) An act that is intended to intimidate or coerce a civilian population or influence or affect the conduct of government or a unit of government through intimidation or coercion.

(b) "Dangerous to human life" means that which causes a substantial likelihood of death or serious injury or that is a violation of [MCL 750.349 or MCL 750.350.]

\*   \*   \*

(h) "Violent felony" means a felony in which an element is the use, attempted use, or threatened use of physical force against an individual, or the use, attempted use, or threatened use of a harmful biological substance, a harmful biological device, a harmful chemical substance, a harmful chemical device, a harmful radioactive substance, a harmful radioactive device, an explosive device, or an incendiary device.  [MCL 750.543b.]

MCL 750.543m(1) was previously challenged as an unconstitutional restriction of free speech in *People v Osantowski*, 274 Mich App 593; 736 NW2d 289 (2007), rev'd in part on other grounds 481 Mich 103 (2008).[4]  This Court concluded that the statute prohibited only statements that are "true threats," and therefore constituted a restriction on free speech that was not unconstitutional.  This Court explained:

First Amendment protections are not absolute and the United States Supreme Court has recognized the permissibility of governmental regulation of certain categories of speech without violating an individual's right to free expression, such as

---

[4] The decision of this Court was reversed by our Supreme Court only to the extent of the scoring of offense variable 20, and its effect on the defendant's sentence.  See *People v Osantowski*, 481 Mich 103, 105; 748 NW2d 799 (2008).

statements deemed to comprise "true threats." *Virginia v Black*, 538 US 343, 358-359; 123 S Ct 1536; 155 L Ed 2d 535 (2003).

> " 'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Id*. at 359. "The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats 'protect[s] individuals from the fear of violence' and 'from the disruption that fear engenders,' in addition to protecting people 'from the possibility that the threatened violence will occur.' " *Black*, supra at 359-360, quoting *RAV v City of St Paul*, 505 US 377, 388; 112 S Ct 2538; 120 L Ed 2d 305 (1992). [*Osantowski*, 274 Mich App at 602.]

This Court thus held that the language of MCL 750.543m and MCL 750.543b(a), reading the two sections together and giving the terms their plain and ordinary meaning, is not an unconstitutional restriction of free speech because it prohibits only true threats, being words that "encompass the communication of a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals," and because the statutes "require the existence of an intent to 'intimidate or coerce.' " *Osantowski*, 274 Mich App at 603. This Court also concluded that in proving a terrorist threat or the making of a false report of terrorism under MCL 750.543m, the only intent that the prosecution must prove is the defendant's general intent to communicate a true threat. *Id*. at 605, citing *Black*, 538 US at 359-360; see also *Buchanan v Crisler*, 323 Mich App 163, 189 n 5; 922 NW2d 886 (2018), quoting *Black*, 538 US at 359 ("There is no constitutional protection for 'true threats,' meaning 'those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals.' ") This Court observed that generally, whether a statement constitutes a true threat is a question of fact for the jury. *Osantowski*, 274 Mich App at 612.

To summarize, to demonstrate that a defendant is guilty of making a terrorist threat under MCL 750.543m(1) the prosecution must prove that the defendant (1) threatened to commit an act of terrorism, [5] and (2) communicated the threat to another person. MCL 750.543m(1)(a). An act

---

[5] The concurrence/dissent would interpret this factor to require the extremely nuanced condition that to threaten to commit an act of terrorism a defendant must threaten an act that the defendant intends will intimidate or coerce, rather than intending that the threat itself (the statement that defendant intends to do the act) be the source of the intimidation or coercion; in other words, that the defendant intend people to fear his threatened actions rather than fear his threat. The concurrence/dissent therefore observes that "whether defendant's *words* were a threat isn't precisely the question." We disagree. Whether defendant can be found guilty of making a terrorist threat depends entirely upon whether the evidence sufficiently demonstrated that defendant's words to Officer Schiavo constituted a threat to commit an act of terrorism, being a threat to do a willful and deliberate act that would be a violent felony under Michigan law, that defendant knew or had reason to know would be dangerous to human life, and that defendant intended would intimidate or coerce a civilian population or influence or affect the conduct of government or a

of terrorism is a willful and deliberate act that (1) would be a violent felony under the laws of this state, (2) is an act that the defendant knows or has reason to know is dangerous to human life, and (3) is an act that is intended to intimidate or coerce a civilian population or influence or affect the conduct of government or a unit of government through intimidation or coercion. MCL 750.543b(a). The prosecution is not required to prove that the defendant had the intent or the capability to actually carry out the threatened act of terrorism, MCL 750.543m(2), but the prosecution must prove the defendant's general intent to communicate a true threat, that is, the "communication of a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals" made with "an intent to intimidate or coerce." *Osantowski*, 274 Mich App at 603, 605.[6]

In this case, the statement that caused defendant to be charged with threatening an act of terrorism is his statement to Deputy Schiavo that if he did not receive the money he was owed, he was going to take care of it himself and "it was going to be hashtag Las Vegas." The first inquiry is whether the evidence supported the conclusion that defendant threatened to commit an act of terrorism and communicated it to another person. Here, the evidence demonstrates that defendant made the statement to the deputy and thus communicated the statement to another person. The question then is whether the statement, "it's going to be hashtag Las Vegas," was a threat of an act of terrorism. That is, the question is whether the evidence demonstrated that by saying "it's going to be hashtag Las Vegas" defendant communicated that he was going to commit a willful and deliberate act (1) that would be a violent felony under the laws of this state, (2) that he knew or had reason to know was dangerous to human life, and (3) that would be intended to intimidate or coerce a civilian population or influence or affect the conduct of government or a unit of government through intimidation or coercion.

---

unit of government through intimidation or coercion. Attempting to separate the intended fear of the threat from the intended fear of the threatened action seems an obscure inquiry; as a practical matter, a threat is feared only if the action threatened is feared.

[6] The concurrence/dissent quotes extensively from an analysis of the legislation that led to the enactment of the statute at issue in this case prepared by the House Legislative Analysis Section, and relies upon that analysis to support its construction of the statute, stating, "It is thus evident that many of my concerns as expressed in this opinion were shared by the Legislature when it enacted the legislation in question." That conclusion is unwarranted. As our Supreme Court has advised, "[I]n Michigan, a legislative analysis is a feeble indicator of legislative intent and is therefore a generally unpersuasive tool of statutory construction." *Frank W Lynch & Co v Flex Technologies*, 463 Mich 578, 587; 624 NW2d 180 (2001). The Supreme Court has further concluded, "In no way can a 'legislative analysis' be said to officially summarize the intentions of those who have been designated by the Constitution to be participants in this legislative process. . . . For that reason, legislative analyses should be accorded very little significance by courts when construing a statute." *In re Certified Question from the US Court of Appeals for the Sixth Circuit*, 468 Mich 109, 115 n 5; 659 NW2d 597 (2003). See also *In re AGD*, 327 Mich App 332, 342; 933 NW2d 751 (2019) (describing legislative bill analyses as "nothing more than the summaries and interpretations of unelected employees of the legislative branch").

To answer this question, we must consider what the term "hashtag Las Vegas" means. The term requires the listener to bring some knowledge of popular culture to the conversation to decipher the meaning. The word hashtag is defined in connection with use on social media websites to indicate a hash mark (#) followed by a word which facilitates a search for that word on social media. However, a secondary use of the word in popular culture is to precede a word or phrase with the word "hashtag" to add emphasis or to make a joke. Thus, it is plausible that the phrase "hashtag Las Vegas" could be used to mean different things; there is no one meaning.

In this case, however, a widely-publicized mass shooting had occurred in Las Vegas less than two weeks before defendant's telephone call to Deputy Schiavo. Defendant's brother Todd, and Todd's wife Elizabeth, both testified that after the telephone call defendant told them that he had made a reference to the Las Vegas shooting when talking to Schiavo. The jury thus reasonably could conclude from this evidence that defendant was referring to the Las Vegas shooting that had occurred two weeks earlier when he used the phrase "hashtag Las Vegas."

Having established that there is evidence to support the conclusion that defendant's statement was a reference to the Las Vegas shooting, the inquiry is whether the evidence supports the jury's conclusion that defendant's reference to the shooting was a threat of an act of terrorism; that is, whether the evidence demonstrated that by referencing the Las Vegas shooting, defendant communicated that he was going to commit a willful and deliberate act (1) that would be a violent felony under the laws of this state, (2) that he knew or had reason to know would be dangerous to human life, and (3) that would be intended to intimidate or coerce a civilian population or influence or affect the conduct of government or a unit of government through intimidation or coercion. In other words, was defendant's reference to the Las Vegas shooting a threat to copy the Las Vegas shooter?

Schiavo testified that defendant said that if he did not get the money he believed he was owed, then it was "going to be hashtag Las Vegas." One plausible meaning of this statement is that defendant was threatening to copy the actions of the shooter in Las Vegas. Clearly, shooting someone would be a violent felony under the laws of Michigan, and such conduct was no doubt known to defendant to be dangerous to human life. It is unclear whether such conduct would be intended to intimidate or coerce a civilian population or to influence or affect the conduct of the government through intimidation or coercion. According to Deputy Schiavo, defendant told him he wanted to obtain a police report related to his 2015 injuries in hopes of prevailing in litigation against Lac O'Seasons Resort. Schiavo testified that when defendant grew frustrated because Schiavo could not produce the report, defendant said that if he did not get the money he believed he was owed, then it was going to be "hashtag Las Vegas." Based on this conversation, it is unclear whether defendant's statement was directed at Deputy Schiavo, Lac O'Seasons Resort, or some unidentified person. However, because defendant's statement suggests that the objective of such an act would be to exact vengeance or to retaliate, it is not unreasonable to conclude that the intent of the act would be to intimidate or to coerce either civilians (people at Lac O'Seasons or perhaps a random crowd as occurred in Las Vegas) or the government (Deputy Schiavo or the police generally).

As noted, a jury may draw reasonable inferences from the evidence and determine the weight of those inferences. *Oros*, 502 Mich at 239. We conclude that sufficient evidence was presented from which the jury reasonably could infer that defendant threatened to commit an act

of terrorism by threatening a willful and deliberate act that (1) would be a violent felony under the laws of this state, (2) defendant knew or had reason to know would be dangerous to human life, and (3) would be intended to intimidate or coerce a civilian population or influence or affect the conduct of government or a unit of government through intimidation or coercion. MCL 750.543b(a). The prosecution also demonstrated that Defendant communicated the threat to another person. MCL 750.543m(1)(a). There was therefore sufficient evidence from which the jury could conclude that the elements of a terrorist threat under MCL 750.543m(1) had been demonstrated.

In addition to these elements, however, the prosecution also was required to demonstrate that defendant's statement was a true threat,[7] meaning that it was the "communication of a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals" made with "an intent to intimidate or coerce." *Osantowski*, 274 Mich App at 603, 605. In this case, defendant made a statement to Deputy Schiavo that suggested that he was threatening an act of violence. Although the statement alone is somewhat cryptic, defendant then clarified the reference when he told other people that he had made a threatening statement to police by referencing the Las Vegas shooting. Defendant thus confirmed that his statement was meant to communicate a serious expression of the intent to commit an act of unlawful violence. That general intent being demonstrated, there was sufficient evidence from which a jury could conclude that the statement was a "true threat." See *id*. at 612 (Generally, whether a statement constitutes a true threat is a question of fact for the jury). Accordingly, on the basis of the entire record and reviewing the evidence in a light most favorable to the prosecutor, a rational trier of fact could have found that there was sufficient evidence to convict defendant of threatening an act of terrorism. See *Harris*, 495 Mich at 126.

Our conclusion is bolstered by a consideration of federal law, which construes the mens rea to prove a threat in a manner consistent with our opinion in this case. The Michigan Anti-Terrorism Act, passed in the wake of the September 11, 2001 terrorist attacks, largely mirrors the federal statute. For example, the definition of "international terrorism" is almost identical to the Michigan definition of terrorism, incorporating "violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State," which "appear to be intended" to "intimidate or coerce a civilian population;" "to influence the policy of a government by intimidation or coercion;" or "to affect the conduct of a government by mass destruction,

---

[7] Although not yet adopted at the time of trial in this case, M Crim JI 38.4 was adopted August 1, 2020, and specifically provides that to prove the crime of making a threat to commit an act of terrorism, the prosecution must prove that the threat "must have been a true threat, and not have been something like idle talk, or a statement made in jest, or a political comment. It must have been made under circumstances where a reasonable person would think that others may take the threat seriously as expressing an intent to inflict harm or damage."

assassination, or kidnapping." Compare 18 U.S.C. § 2331(1) and MCL 750.543b.[8] Other definitions within the Michigan statute align with comparable federal definitions.[9]

Unlike Michigan's Anti-Terrorism Act, the federal statute does not have one catch-all threat provision. Rather, for those offenses for which Congress wished to criminalize threats, it created specific subsections doing so. For example, the offense "[a]cts of terrorism transcending national boundaries," 18 U.S.C. § 2332b, the elements of which are very similar to the Michigan statute except for the requirement of crossing international boundaries, provides that "[w]hoever threatens to commit an offense" defined in § 2332b(a)(1), "or attempts or conspires to do so," shall be punished as provided by the statute. 18 USC § 2332b(a)(2).

Although there are numerous federal threat statutes covering a range of threats, these statutes do not define the words "threat" or "threaten." In *Elonis v United States*, 575 US 723; 135 S Ct 2001; 192 L Ed 2d 1 (2015), the U.S. Supreme Court interpreted 18 USC § 875(c), which criminalized the transmission in interstate commerce of a communication containing a threat to kidnap any person or to injure the person of another; at issue was the mens rea requirement for a violation of the statute. In discussing a "threat," the Supreme Court observed generally that "[t]he parties agree that a defendant under Section 875(c) must know that he is transmitting a communication. But communicating *something* is not what makes the conduct 'wrongful.' Here 'the crucial element separating legal innocence from wrongful conduct' is the threatening nature of the communication. The mental state requirement must therefore apply to the fact that the communication contains a threat." *Id*. at 135 S Ct at 2011 (internal citation omitted).

Similarly, under the federal terrorism statute it is the threatening nature of the communication that makes it worthy of criminal sanction, which does not and should not require the same mens rea as a completed substantive offense. That is, to constitute a threat for purposes of federal terrorism law, there is no requirement that a defendant have the mens rea of intending

---

[8] 18 USC § 2331 does not define a criminal offense. Rather, its definition of terrorism serves as a prerequisite for other actions, such as granting the Attorney General primary investigative responsibility over all federal acts of terrorism, 18 USC § 2332b(f), and providing a civil remedy for any United States national injured by an act of international terrorism, 18 USC § 2333. An almost identical definition, see 18 USC § 2332b(g)(5), is provided for the term "Federal crime of terrorism," which applies to the sections defining various terrorism-related criminal offenses. See 18 USC § 2332a-2332h.

[9] Compare MCL 750.543b(d) (defining "material support or resources," and 18 USC § 2339A(b)(1) (defining the same); MCL 750.543b(c) (defining "harmful biological substance", "harmful biological device", "harmful chemical substance, "harmful chemical device", "harmful radioactive material, and "harmful radioactive device") with 18 USC §§ 2332a(c)(2)(B), (C), and D (defining similar materials in similar ways); 18 USC § 2339B(g)(6) (defining the term "terrorist organization" for purposes of statute prohibiting "material support of a foreign terrorist organization," 18 USC § 2339B, with MCL 750.543c (defining "terrorist organization" in the same manner).

to intimidate a particular population or government; the transmission of a threat to commit an act that would have that effect is sufficient. Indeed, if a defendant had the same mens rea required for the substantive offense, it would require only a "substantial step" towards completion of the offense to transform a "threat" into an "attempt." But threats are categorically different and pose a danger regardless of whether an individual actually intended to carry them out, as long as the threat constitutes a "true threat."

Given the similarity between the federal and Michigan approaches to terrorism, and the dangers posed by threats, it is apparent that Michigan's Legislature, in enacting MCL 750.543m(a), intended to address those evils through a lesser mens rea than is required for a complete substantive offense. The construction placed on that statute by the concurrence/dissent would frustrate that purpose. We therefore conclude that the Legislature did not intend to impose the intent requirement the concurrence/dissent concludes the statute requires, but rather required only a true threat. The evidence here fully met that standard.

## C. MALICIOUS USE OF TELECOMMUNICATIONS SERVICES

We also conclude that the record supports the jury's conclusion that defendant was guilty of malicious use of a telecommunications service beyond a reasonable doubt. MCL 750.540e(1)(a) provides:

> (1) A person is guilty of a misdemeanor who maliciously uses any service provided by a telecommunications service provider with intent to terrorize, frighten, intimidate, threaten, harass, molest, or annoy another person, or to disturb the peace and quiet of another person by any of the following:
>
> (a) Threatening physical harm or damage to any person or property in the course of a conversation or message through the use of a telecommunications service or device.

"Telecommunications" and "telecommunications service" are defined as

> any service lawfully provided for a charge or compensation to facilitate the origination, transmission, retransmission, emission, or reception of signs, data, images, signals, writings, sounds, or other intelligence or equivalence of intelligence of any nature over any telecommunications system by any method, including, but not limited to, electronic, electromagnetic, magnetic, optical, photo-optical, digital, or analog technologies. [MCL 750.219a(6)(a).]

There is no dispute that defendant used a telecommunications service when he made the October 12, 2017 phone call to the Iron County Sheriff's Department. A trier of fact could reasonably infer that defendant threatened to shoot people, thus threatening physical harm or damage to a person or property. Defendant's brother and sister-in-law testified that defendant stated that he had communicated a threat to the Iron County Sheriff's Department during a phone call by referencing the Las Vegas shooting. A trier of fact could reasonably infer that defendant intended to frighten, intimidate, or threaten another person when he made the statement during the October 12, 2017 phone call.

-11-

Viewing the evidence in a light most favorable to the prosecutor, a rational trier of fact could have found that there was sufficient evidence to convict defendant of maliciously using a telecommunications service. See *Harris*, 495 Mich at 126.

Affirmed.

/s/ Michael F. Gadola
/s/ Jonathan Tukel